UNITED STATES of America, Plaintiff-Appellee,

v.

Joseph CONFORTE and Sally Conforte, Defendants-Appellants.

Nos. 77–3956, 78–3310.

United States Court of Appeals, Ninth Circuit.

April 29, 1980.

Rehearing Denied Aug. 11, 1980.

---

Bruce I. Hochman, Beverly Hills, Cal., argued for defendants-appellants; Harry E. Claiborne, Oscar B. Goodman, Las Vegas, Nev., Hochman, Salkin & Deroy, Beverly Hills, Cal., on brief.

Leland Lutfy, Asst. U. S. Atty., Reno, Nev., argued for plaintiff-appellee; Clyde R. Maxwell, New Port Beach, Cal., on brief.

Before KENNEDY and TANG, Circuit Judges, and PALMIERI,* District Judge.

* Honorable Edmund L. Palmieri, United States District Judge for the Southern District of New York, sitting by designation.

KENNEDY, Circuit Judge:

█ This is an appeal from a judgment of conviction in a tax evasion case. The appellants, Joseph and Sally Conforte, are the operators of an establishment called "Mustang Ranch," described in the record as a legalized house of prostitution located in Nevada. The Confortes were convicted on four separate violations of 26 U.S.C. § 7201 for willful acts taken to evade or defeat federal employment taxes for the last quarter of 1974 and the first three quarters of 1975. The Government's case was that the appellants willfully failed to file employment tax returns, to withhold income taxes, or to pay employment taxes for certain employees who worked at the Mustang Ranch establishment. The employees in question were not prostitutes but were so-called auxiliary personnel such as maids, bartenders, security guards, and cashiers. The district court tried the case without a jury. We agree with the trial court that the Government established that appellants' failure to file employment tax returns for these auxiliary personnel was flagrant, and part of a willful scheme to evade federal taxes on a substantial scale. We therefore affirm the convictions.

I

*Convictions for Tax Evasion*

Conviction under section 7201 requires proof beyond a reasonable doubt of each of the following elements: (1) the existence of a tax deficiency; (2) willfulness; and (3) an affirmative act constituting an evasion or attempted evasion of the tax. *Sansone v. United States*, 380 U.S. 343, 351, 85 S.Ct. 1004, 1010, 13 L.Ed.2d 882 (1965); *Lawn v. United States*, 355 U.S. 339, 78 S.Ct. 311, 2 L.Ed.2d 321 (1958); *Holland v. United States*, 348 U.S. 121, 75 S.Ct. 127, 99 L.Ed.2d 150 (1954); *Spies v. United States*, 317 U.S. 492, 63 S.Ct. 364, 87 L.Ed. 418 (1943). Appellants contend that the employers had no obligation to withhold income taxes or pay Social Security taxes since the auxiliary personnel received no salary, but only tips from the prostitutes. They argue, moreover, that even if the com-

pensation is classified in law as a wage, the appellants believed it to be tips, so the failure to file was not willful. As part of the defense that there was no willful criminal conduct, the appellants claim that they were relying upon their tax counsel's negotiations with the Internal Revenue Service, negotiations which continued during the quarterly tax periods in which the violations occurred. We reject these contentions and conclude that the Government has met its burden of proof on each element.

A. Tax Deficiencies

As even the Confortes' counsel conceded from the outset of trial, the auxiliary personnel in question were employees, not independent contractors. The argument that withholding was not required thus turns upon whether the employees received wages, as distinct from tips. An examination of the compensation procedures used at the brothel leaves us with little doubt that the term "tip" is entirely inaccurate to describe the compensation paid to the auxiliary employees. The compensation paid to the auxiliary employees would be defined as a wage by lay people and tax experts alike.

The system used to pay the Mustang Ranch employees during the four tax quarters in question was this: An employee designated as a cashier took all the monies earned by the prostitutes. The cashier returned to them one-half of their earnings for each shift, less ten percent. If the prostitute earned less than $50.00, no money was deducted from her half share. No money was taken from that portion of the prostitute's earnings in excess of $100.00. The ten percent deduction was designated a "board fee," and the total board fees so retained were denominated by the Confortes as a "tip fund." At the end of each day or night shift, the cashier paid both the prostitutes and the auxiliary employees, the cashier herself being included in this latter category. The cash payments to the auxiliary employees were said to be taken from the "tip fund." Apparently, there was no physical separation of the cash in the drawer, the "tip fund" constituting simply an accounting designation. The compensation

to auxiliary employees from the "tip fund" was a fixed payment per shift, such as $30.00 for a maid and $35.00 for a security guard. If the "tip fund" was insufficient for payment, Joseph Conforte would put more cash in the drawer. Any funds remaining in the drawer after these payments were, of course, retained by the Confortes. The prostitutes kept track of their earnings, typically on index cards, and the cashier made certain summaries on binder paper or lined yellow paper. These records were routinely burned, as discussed further below.

■ The Conforte's argument that the employees received tips and not wages is so far removed from the economic facts of the case that the term "tip fund" used by the Confortes is itself a factor tending to show a willful attempt to evade taxes. The trial judge expressly so found, and we agree. The funds paid the auxiliaries were wages as that term is defined in 26 U.S.C. §§ 3121, 3401. See United States v. Fleming, 293 F.2d 953 (5th Cir. 1961).

To begin with, the employers were the Confortes, not the prostitutes. The Confortes supervised the employees and exercised authority over hiring and firing. The employees who testified said they considered the Confortes to be their bosses. The Confortes set the rates of compensation. A necessary inference from the record is that the "tip fund" was sometimes in excess of the amounts required for the auxiliary personnel and that sometimes it was insufficient. It was in the latter instances that Joseph Conforte put additional funds in the cash drawer. There is no evidence whatever that the prostitutes set the auxiliaries' pay, or even that they knew the amount. There is no evidence they had any control over the auxiliaries. The Confortes, in short, had complete control over the auxiliaries, their rate of pay, hours, working conditions, and term of employment. For a set hourly period, the auxiliaries were paid fixed sums, which had a direct relationship to the value of the services they performed. These sums were paid from the Confortes' gross revenue and from funds which the Confortes put in the cash drawer. These sums were wages paid by the employers, and the employers were the Confortes. See United States v. Silk, 331 U.S. 704, 716–19, 67 S.Ct. 1463, 1469–71, 91 L.Ed. 1757 (1947); McCormick v. United States, 531 F.2d 554, 209 Ct.Cl. 331 (1976); N.L.R.B. v. Nello Pistoresi & Son, 500 F.2d 399, 400 (9th Cir. 1974); Humble Pipe Line Co. v. United States, 442 F.2d 1353, 1356, 194 Ct.Cl. 944 (1971); McGuire v. United States, 349 F.2d 644 (9th Cir. 1965); Fahs v. Tree-Gold Co-Op Growers of Florida, 166 F.2d 40 (5th Cir. 1948).

■ While there are some cases in which the distinction between tips and wages must be defined with some precision, a rudimentary requirement is that a tip is a payment made by a person who has received a personal service. Roberts v. Commissioner, 176 F.2d 221, 225 (9th Cir. 1949); Olk v. United States, 388 F.Supp. 1108, 1111 (D.Nev.1975), rev'd on other grounds, 536 F.2d 876 (9th Cir.), cert. denied, 429 U.S. 920, 97 S.Ct. 317, 50 L.Ed.2d 287 (1976). Since the Confortes, not the prostitutes, set the fee, made the payments and received the services, that element is absent here. A second essential element is that the tip be a voluntary payment in an amount, and to a person, designated by the customer. Restaurants and Patisseries Longchamps, Inc. v. Pedrick, 52 F.Supp. 174, 174–75 (S.D.N.Y. 1943); 8A J. Mertins, The Law of Federal Income Taxation § 47A.04 (1978). This element is also absent; contributions from the prostitutes were mandatory. The auxiliary services were rendered to the establishment as an enterprise, not to the prostitutes individually. The scope of duties performed by the auxiliary personnel was sufficiently broad so that a base rate of pay from the establishment, not tips, is the normal method of compensation, and that was the compensation plan adopted by the Confortes. This holding is consistent with rulings issued by the Treasury Department in characterizing income as wages rather than tips where services are rendered to the enterprise as a whole, and not to individuals who allegedly receive the service. See Rev.Rul.

69–28, 1969–1, C.B. 270–71; Rev.Rul. 145, 1937–1 C.B. 443; Rev.Rul. 301, 1938–1 C.B. 455; Rev.Rul. 69–28, 1969–1 C.B. 270; Rev. Rul. 75–400, 1975–2 C.B. 464; Rev.Rul. 76–231, 1976–1 C.B. 378.

■ The record contains a further refutation of the argument that the base compensation paid to the employees consisted of tips, in that occasionally auxiliary employees would do personal errands for the prostitutes and would receive true gratuities for those services. These sums were tips, and since contra-distinct from the employees' base pay, the difference in the two sums is clearly revealed. A final factor to establish that the base amounts paid to the auxiliary personnel from the board fund were wages, rather than tips, is that various of the service personnel were paid their salary from the "tip fund" while on vacation, notwithstanding their absence from work. Such vacation allowances constitute wages, not tips. *See* 26 C.F.R. § 31.3306(b)–1(g). We conclude that the Government has established beyond a reasonable doubt that employment taxes were due and that withholding was required for the quarters in question.

### B. Willfulness

■ Willfulness requires a showing of specific wrongful intent to avoid a known legal duty. *United States v. Pomponio*, 429 U.S. 10, 12, 97 S.Ct. 22, 23, 50 L.Ed.2d 12 (1976); *United States v. Bishop*, 412 U.S. 346, 93 S.Ct. 2008, 36 L.Ed. 941 (1973); *United States v. Hawk*, 497 F.2d 365, 366–69 (9th Cir.), *cert. denied*, 419 U.S. 838, 95 S.Ct. 67, 42 L.Ed.2d 65 (1974). It is a state of mind of the taxpayer wherein he is fully aware of the existence of a tax obligation to the Government which he seeks to avoid. *United States v. Martel*, 199 F.2d 670, 672 (3rd Cir. 1952). This element was proved beyond a reasonable doubt.

The Confortes argue that the failure to report wages, even if a violation of the Revenue Code, was not willful because the distinction between tips and wages is a difficult one to make. We have already indicated that complexities or the necessity for fine distinctions are not present in this case. *See United States v. Buckner*, 610 F.2d 570 (9th Cir. 1979). The Confortes were not strangers to federal tax requirements for employers. During the tax periods here in question, Sally Conforte filed employment tax returns for a restaurant of which she and Joseph Conforte were the proprietors. There were, moreover, numerous other acts shown from which it is proper to infer a willful plan to defraud the Government.

■ Direct proof of a taxpayer's intent to evade taxes is rarely available. Willfulness may be inferred, however, by the trier of fact from all the facts and circumstances of the attempted understatement of tax. In *Spies v. United States*, 317 U.S. 492, 63 S.Ct. 364, 87 L.Ed. 418 (1943), the Supreme Court listed some circumstances from which willfulness may be inferred:

> keeping a double set of books, making false entries or alterations, or false invoices or documents, destruction of books and records, concealment of assets or covering sources of income, handling one's affairs to avoid making the records used in transactions of the kind, and any conduct the likely effect of which would be to mislead or conceal.

*Id.* at 499, 63 S.Ct. at 368. *See also Smith v. United States*, 348 U.S. 147, 159, 75 S.Ct. 194, 200, 99 L.Ed. 192 (1954) (extensive use of currency and cashier's checks to satisfy obligations); *Holland v. United States*, 348 U.S. 121, 75 S.Ct. 127, 99 L.Ed. 150 (1954) (pattern of understatement of income in successive years); *United States v. Murdock*, 290 U.S. 389, 395, 54 S.Ct. 223, 225, 78 L.Ed. 381 (1933) (use of memory, surmise, estimates, or a careless disregard in making of tax returns); *United States v. Fahey*, 510 F.2d 302 (2d Cir. 1974) (taxpayer's effort not to learn what his tax obligations are); *Warring v. United States*, 222 F.2d 906, 909 (4th Cir.), *cert. denied*, 350 U.S. 861, 76 S.Ct. 102, 100 L.Ed. 764 (1955) (presence of large sums of money in cash not deposited in a bank highly suspicious).

The Confortes conducted an operation at the Mustang Ranch that is consistent with

almost no other inference but an intent to defraud the Government of its taxes. The receipts and payments for virtually all of the expenses for the Mustang Ranch operation were handled in cash. Some idea of the size and sophistication of the operation may be gathered from the fact that the license fee for the brothel (paid to the sheriff in cash) was initially $25,000 per year, later increased to $30,000 per year. The employees were paid daily in cash. There was evidence, expressly credited by the district court, that the employees were told by the Confortes not to report their wages. More than twenty employees testified, and of these only two apparently reported their wages to the Government. Using assumptions that would state the employment taxes due for the quarters here in question at a minimum, the Government's expert witness testified that there was a failure to withhold over $54,000 in federal employment taxes.

It was a regular practice, testified to by five witnesses who were themselves responsible for carrying it out, for appellants to burn the records showing what the prostitutes earned and the summary sheets showing what was paid to the auxiliary employees. Testimony indicated that Joseph Conforte himself had delivered records to the security men to be burned. This was so even though other refuse was hauled away from the premises. These acts of burning are affirmative acts constituting an attempted evasion of the tax. Appellants argue that the records were burned openly on the premises; but even assuming, contrary to the evidence, that the precise nature of the burning operation was widely observed and understood, the act would be as consistent with knowing destruction of records as it was with innocence, and the trial judge found, properly in our view, that it was the former.

C. Reliance on Advice of Counsel

■ Our cases establish that reliance on advice of counsel in tax evasion cases is not a complete defense, but only a circumstance indicating good faith which the trier of fact is allowed to consider on the issue of willfulness. *United States v. Crum,* 529 F.2d 1380, 1383 (9th Cir. 1976); *see Bisno v. United States,* 299 F.2d 711, 719 (9th Cir. 1961).

The indicia of willfulness set forth above are sufficient in themselves to demonstrate that the appellants' allegation of reliance on advice of counsel or on representations made by the IRS is not a claim made in good faith, but because counsel contend vigorously on appeal that the Confortes and their tax attorney were misled we address that argument separately.

In October and November, 1972, the Internal Revenue Service sent a determination letter to about twenty-five brothel operators in the State of Nevada. Such a letter was sent to the Confortes on November 9, 1972. The letter stated in part:

The Internal Revenue Service has recently completed an examination of the organized houses of prostitution throughout the State of Nevada. It has been determined that you are an employer, as defined in the Internal Revenue Code, Section 3401(d) and Treasury Regulations Section 31.3306(i)–1(b)–1(d) and, therefore, subject to the laws and regulations pertaining to Withholding Tax and Federal Insurance Contribution Act taxes.

. . . . .

Consequently, beginning with the fourth quarter 1972, you will be required to file Form 941, "Employer's Quarterly Federal Tax Return", including Withholding and Social Security taxes on all prostitutes, maids, bartenders, and any other persons working in your establishment.

. . . . .

Your attention is particularly directed to the depositing requirements and the fact that severe civil or criminal penalties may be imposed for failing to comply timely with the regulations, both as to depositing withheld taxes and filing returns.

Mr. Clyde Maxwell, an experienced attorney specializing in tax matters, had represented the Confortes previously. After the determination letter had been mailed to the brothel owners, the Confortes and twenty-

four or so operators of similar establishments retained Maxwell to represent them in connection with the determination letter. The Confortes executed powers of attorney in Maxwell's favor.

Maxwell met with the Internal Revenue Service in Washington, and after discussions with them wrote a letter to each brothel owner, including the Confortes. The letter, dated January 30, 1973, stated, in part:

In the meantime, I have assurance that no action will be taken against my clients until this matter has been completely resolved.

This letter, Exhibit 61 at trial, was proffered by the Confortes and their counsel to establish that the Confortes' continued failure to file employment tax returns was not willful.

Maxwell's discussions with the Internal Revenue Service continued until 1976. All of the discussions concerned the issue of whether or not brothel operators should withhold earnings for the prostitutes. There was no discussion as to the auxiliary personnel. (Maxwell said it was "mentioned in passing" but three revenue agents testified the question did not come up at all). Maxwell explains this by stating that the issue of the prostitutes constituted a significantly greater liability for tax assessments than in the case of the auxiliary personnel, so that it occupied the center of his attention. At Maxwell's request, the Internal Revenue Service issued a technical ruling on the prostitute issue in January of 1974. It. was adverse. In 1975 Maxwell and the Internal Revenue Service arranged for two test cases on the issue of withholding income for prostitutes. Employment taxes would be paid for two such persons, to be followed by a refund claim which the IRS would deny promptly so district court refund actions could proceed. The Confortes were indicted in August, 1977. Maxwell testified that the first he knew of any criminal investigation was a day before the indictment was issued. Aside from the overwhelming evidence of willfulness discussed above, we think there is ample support in the record for the district court to reject the appellants' professed claim of good faith reliance on counsel or on Internal Revenue Service assurances.

While it is clear to us now what compensation procedures and employment arrangements prevailed at the Mustang Ranch in 1974 and 1975, these details were not known with such specificity to the Internal Revenue Service. Agent Zuver of the Nevada district testified that the nature and extent of the failure to withhold for auxiliary employees came to his attention in early 1975 when the omission of any Mustang Ranch personnel was noted in a routine audit of the form 941 filed by Sally Conforte for the restaurant operation.

■ Essential to the claim of reliance on counsel is a showing that the reliance be in good faith and that the advice be obtained after full disclosure of all of the facts to which the advice pertains. *See United States v. Mitchell*, 495 F.2d 285, 287 (4th Cir. 1974); *United States v. Stone*, 431 F.2d 1286, 1289 (5th Cir. 1970), *cert. denied*, 401 U.S. 912, 91 S.Ct. 879, 27 L.Ed.2d 811 (1971); *Bursten v. United States*, 395 F.2d 976, 982 (5th Cir. 1968); *Bisno v. United States*, 299 F.2d 711, 719–20 (9th Cir. 1961). The defendant must also show that he actually relied on the advice, believing it to be correct. *Id.* None of these requisites was met in the instant case. From Maxwell's testimony it appears that the first time he discussed the auxiliary employees in detail with the Confortes was after the quarters during which the violations in question occurred. Maxwell did not testify that he had any conversations with the Confortes before that time regarding the necessity of paying employment taxes for the support personnel. Indeed, the record permits the rather clear inference that Mr. Maxwell did not want to know too much about how the auxiliary employees were paid. There is simply no evidence that Maxwell knew of the subterfuge adopted at the Mustang Ranch, and, moreover, there is no evidence that the IRS knew of it either.

The one sentence statement in Exhibit 61 cannot be construed as advice from the IRS

or from Maxwell that the Confortes were free to adopt the course of conduct they did in the relevant financial quarter of 1974 and 1975. All of Maxwell's written communications to his clients concerned the prostitute issue. And in August, 1973, he wrote all of them, including the Confortes, asking them to "[a]dvise if you or anyone you know is being audited." Even if some assurances had been given to Maxwell with respect to a stay of proceedings against the Confortes on the issue of withholding for auxiliary employees (and we emphasize the record does not permit this inference) the IRS would not be bound by it if the assurance was obtained after facts showing a clear scheme to defraud were deliberately withhold from revenue officials. Moreover, the record is barren of any evidence which would indicate that the Confortes in any way relied on the IRS determination letter or on Maxwell's communications in structuring their method of compensating the auxiliary personnel.

The defense of reliance on advice of counsel, and the related claim made here of reliance on statements purportedly made to counsel by the Government, fail not only because there was an insufficient disclosure of the factual predicate for such advice, but also because there is no testimony that such advice was ever given. There was no testimony that Maxwell had advised the Confortes that they had a right not to pay employment taxes for the auxiliary personnel. Such advice would have been most unlikely because, on these facts, it would have been professionally irresponsible to give it. Our conclusion that Maxwell never gave such advice is buttressed by the fact that some twenty-three of the other brothel operators that he was representing did, during the periods in question, withhold income and file employment tax returns for auxiliary personnel.

■ In short, none of the necessary premises for a reliance on counsel defense was established. When essential background facts are not furnished by the client to the attorney, when there is no testimony that advice from counsel as to a specific course of conduct was solicited, and when it is highly unlikely that, if solicited, advice constituting a defense to a willful violation would have been given in any event, then no foundation exists at all for the claim of good faith reliance on counsel, and the trier of fact is well within its province to reject it.

■ We should make one additional point regarding the sufficiency of the evidence to sustain the conviction of Sally Conforte. Counsel argue that it was not shown that she engaged in any willful evasion of the tax laws. We think there is adequate evidence to support the conviction as to Mrs. Conforte. She was the one who filed the returns for the restaurant operation; she took an active role in supervising employees at the Mustang Ranch; correspondence from Maxwell was directed specifically to her. From this evidence it was proper for the trial judge to infer that she was guilty on all four counts.

## II

### Alleged Bias and Prejudice

Appellants contend that even if the evidence was sufficient to sustain the convictions for tax evasion, the case should be remanded for a new trial because newly discovered evidence indicates that Judge Bruce R. Thompson had been biased and prejudiced against them at trial. The motion for a new trial on this ground was heard by Judge Warren J. Ferguson, who denied it after making careful findings and writing an extensive and thoughtful opinion. 457 F.Supp. 641 (D.Nev.1978). We affirm Judge Ferguson's ruling.

The facts were set out extensively below, and we need restate them only briefly here. In 1972 Joseph Conforte submitted an application to the American Contract Bridge League's Reno Unit, of which Judge Thompson was President. The unit decided to reject Conforte's application because of his prior felony convictions and his proprietorship of a house of prostitution. Acting at the request of the Reno unit, Judge Thompson wrote, on court stationery, to the

National Headquarters of the Bridge League to inquire whether the unit was permitted to reject Conforte's application. The National Headquarters responded that rejection was proper and Judge Thompson wrote a letter of rejection to Conforte on court stationery.

In 1973 Judge Thompson attended a cocktail party after a University of Nevada football game. The topic of raising funds for the team was discussed, and Joseph Conforte was mentioned as a possible contributor. Judge Thompson advised against accepting a contribution from him because Conforte ran a house of prostitution. He also stated that the only problem with one member of the athletic staff was that he was a good friend of Conforte. The Judge also said Conforte was "not good for Reno."

■■■■ A threshold issue we address is the timeliness of appellants' motion for new trial, to the extent it rests on the bridge club incident. When newly discovered evidence is the basis for a new trial motion, it is necessary to show that the evidence could not have been discovered with due diligence at a time early enough to form the basis for a timely motion at or before trial. *United States v. Cervantes*, 542 F.2d 773, 779 (9th Cir. 1976); *see United States v. Beasley*, 582 F.2d 337 (5th Cir. 1978); *United States v. Brashier*, 548 F.2d 1315, 1327 (9th Cir.), *cert. denied*, 429 U.S. 1111, 97 S.Ct. 1149, 51 L.Ed.2d 565 (1977). A showing of due diligence was not made here. Mr. Conforte testified that he destroyed Judge Thompson's letter of rejection upon receiving it and told no one about it. The rejection letter put Conforte on notice that Judge Thompson had had at least some involvement with the decision to reject his application to the American Contract Bridge League, although concededly Conforte did not know the tenor of the correspondence. Conforte neither informed his attorneys of the letter nor conducted even a minimal investigation of the incident prior to trial. In view of this, the district court acted well within its discretion in concluding that appellants failed to meet their burden of establishing that they could not have discovered with diligence the evidence in time to make an appropriate motion at or before trial. *United States v. Schwartzbaum*, 527 F.2d 249, 254 (2d Cir. 1975), *cert. denied*, 424 U.S. 942, 96 S.Ct. 1410, 47 L.Ed.2d 348 (1976). Because the motion on this ground is not timely, we do not consider it, although by so doing we do not intimate that the conduct in question would have been grounds for finding bias or prejudice in any event.

In view of recent discussions in this circuit and in others of the requirement of timeliness for disqualification motions under 28 U.S.C. § 455, and in order to address further arguments made by the appellants, we are required to examine whether the rules of disqualification of judges are such that the argument Mr. Conforte makes can be raised for the first time on appeal notwithstanding the above rules pertaining to newly discovered evidence generally. This was a question left open in *United States v. Sibla*, 624 F.2d 864, No. 78–1724, (9th Cir. March 3, 1980, as amended April 28, 1980). In that case the disqualification objection had been raised under 28 U.S.C. § 144, and we held the objection was specific enough to bring it to the attention of the trial judge in a timely manner under 28 U.S.C. § 455.

■■■■ There were no factors here to excuse failure to raise the claim in the trial court, or to permit raising the issue on appeal. The defendant had received a letter which was notice to him of the grounds now urged for disqualification, and he failed to remind the judge of the matter even when the question of the judge's qualification to sit was expressly discussed before trial. In these circumstances the grounds for recusal of the trial judge under section 455 may not be raised for the first time on appeal. The Second Circuit has held that the requirements of timeliness under section 144 are applicable as well to a section 455 motion. *In re International Business Machines Corp.*, 618 F.2d 923, 927 (2d Cir. 1980). The Seventh Circuit has adopted language which, broadly interpreted, may indicate that timeliness is not a

requirement for raising an objection under section 455. *SCA Services, Inc. v. Morgan,* 557 F.2d 110, 117 (7th Cir. 1977). If so construed, the statement in *SCA Services* would be dictum, since there an objection to qualification was made in the district court before trial on the merits. We conclude timeliness cannot be disregarded in all cases involving the delicate matter of disqualification under section 455, although, as we did in *Sibla,* we leave open here the question whether timeliness may be disregarded in exceptional circumstances.

We do find it necessary to address the question of the remarks made concerning Mr. Conforte at the university function. Appellants contend they should be granted a new trial because these remarks indicate grounds for disqualification under 28 U.S.C. § 455(a) & (b). The statute, as amended in 1974, provides:

> (a) Any justice, judge, magistrate, or referee in bankruptcy of the United States shall disqualify himself in any proceeding in which his impartiality might reasonably be questioned.

> (b) He shall also disqualify himself in the following circumstances:

> (1) Where he has a personal bias or prejudice concerning a party, or personal knowledge of disputed evidentiary facts concerning the proceeding;

> . . . . .

> (e) No justice, judge, magistrate, or referee in bankruptcy shall accept from the parties to the proceeding a waiver of any ground for disqualification enumerated in subsection (b). Where the ground for disqualification arises only under subsection (a), waiver may be accepted provided it is preceded by a full disclosure on the record of the basis for disqualification.

■ The statute imposes a self-enforcing duty on the judge, but its provisions may be asserted also by a party to the action. *Davis v. Board of School Comm'rs,* 517 F.2d 1044, 1051 (5th Cir. 1975), *cert. denied,* 425 U.S. 944, 96 S.Ct. 1685, 48 L.Ed.2d 188 (1976).

Recusal whenever a judge has a "personal bias or prejudice concerning a party" is required also by 28 U.S.C. § 144. We examined the relation between the two statutes in *United States v. Olander,* 584 F.2d 876 (9th Cir. 1978), and held that the decisions interpreting section 144 are also controlling in the interpretation of the bias and prejudice language in section 455(b)(1). *Id.* at 882; *see In re International Business Machines Corp.,* 618 F.2d 923 (2d Cir. 1980); *United States v. Haldeman,* 559 F.2d 31, 132 (D.C. Cir. 1976), *cert. denied,* 431 U.S. 933, 97 S.Ct. 2641, 53 L.Ed.2d 250 (1977); *United States v. Hall,* 424 F.Supp. 508, 533 (N.D. Okl.1975), *aff'd,* 536 F.2d 313 (10th Cir. 1976); 13 C. Wright, A. Miller & E. Cooper, Federal Practice & Procedure § 3542, at 345-46 (1975). A second point we made in *Olander* concerned the distinction between two subsections of section 455. We stated: "It would be incorrect as a matter of statutory construction to interpret section 455(a) as setting up a different test for disqualification for bias or prejudice from that in section 455(b)(1)." 584 F.2d at 882.

■ We interpret this to mean that the standard for determining the appearance or fact of the particular grounds for disqualification is the same, but not that the reach of the two sections is in all cases coextensive. The standard for measuring the grounds of disqualification is similar, but the sections reach different factual contexts. *Olander* does not undercut the recognition that there may be cases within subsection (a) that are not within subsection (b); and we think this must be so or subsection (e), which allows waiver of disqualification under the former subsection but not the latter, would be without meaning. We need not examine for purposes of this case the comparative reach of the two sections, other than to suggest that subsection (a) is designed to cover contingencies not foreseen by the draftsmen, who set out specific grounds for disqualification under subsection (b). This interpretation is consistent with the legislative history, which describes subsection (a) as a "general, or catch-all, provision." H.Rep. No. 1453, 93rd Cong., 2d

Sess., *reprinted in* [1974] U.S.Code Cong. & Admin.News 6351, 6354. Subsection (a) was described as establishing an objective standard which required disqualification "if there is a reasonable factual basis for doubting the judge's impartiality." *Id.* at 6355. Subsection (b), on the other hand, was addressed to specific instances "which are in addition to the general standards set up in section (a)." *Id.* When these specific instances are present, the inquiry must proceed under subsection (b), rather than subsection (a), and waivers may not be accepted.

■ There may also be room in subsection (a) for somewhat greater operation of the principle that a ground of disqualification may be the appearance of partiality. We recognize, as indeed is apparent from subsection (b), that many cases exist where the mere appearance of partiality suffices for nonwaivable disqualification. It is a general rule that the appearance of partiality is as dangerous as the fact of it. *Potashnick v. Port City Construction Co.*, 609 F.2d 1101 (5th Cir. 1980); *United States v. McDonald*, 576 F.2d 1350 (9th Cir.), *cert. denied*, 439 U.S. 830, 99 S.Ct. 105, 58 L.Ed.2d 123 (1978); Note, *Disqualification of Judges and Justices in the Federal Courts*, 86 Harv. L.Rev. 736, 745 (1973). Certain instances may arise under subsection (a), however, wherein a seeming ground of disqualification can be adequately explained and then waived.

■ Returning to the instant case, the specific ground alleged for disqualification is bias or prejudice, and we think the test under either subsection (a) or (b) is the same, namely, whether or not given all the facts of the case there are reasonable grounds for finding that the judge could not try the case fairly, either because of the appearance or the fact of bias or prejudice. We find no reasonable grounds for questioning the judge's impartiality because of bias or prejudice. While bias or prejudice may spring from many sources, often extrajudicial in their origin, the negative bias or prejudice of the kind alleged here will disqualify only if it is an attitude or state of mind that belies an aversion or hostility of a kind or degree that a fair-minded person could not entirely set aside when judging certain persons or causes. It is an animus more active and deep-rooted than an attitude of disapproval toward certain persons because of their known conduct, unless the attitude is somehow related also to a suspect or invidious motive such as racial bias or a dangerous link such as a financial interest, and only the slightest indication of the appearance or fact of bias or prejudice arising from these sources would be sufficient to disqualify. Judged by these standards, nothing in Judge Thompson's remarks indicates a disqualification to hear the case.

It is not surprising that Judge Thompson would know of Conforte's activities and that he would have a less than high opinion of them. The record discloses that Joseph Conforte does not keep a low profile in Reno and its surrounding areas. He not only owns and operates a house of prostitution in Storey County, but also invites publicity for his activities. Judge Thompson also knew, from his official capacity, that Conforte was a twice-convicted felon. The fact that Judge Thompson advised against soliciting contributions from Conforte, given all of the circumstances of this case, does not provide a basis for questioning his impartiality in trying the case. It is reasonable to expect a judge to advise against involving educational institutions with brothel owners or felons, and we would not think that because of this advice the judge was unable to give the defendant a fair trial.

■ Appellants contend that their waiver of a jury trial was invalid because Judge Thompson did not disclose his part in the bridge club and cocktail party incidents. We disagree. Appellants and their attorneys discussed the possible waiver of a jury trial for days preceding the waiver. Joseph Conforte took an active role in these discussions. Judge Thompson explained to appellants the differences between a bench and jury trial before accepting the waiver. The specific requirements of Fed.R.Crim.P.

23(a) were complied with. Appellants were sufficiently informed of the basis for Judge Thompson's negative views about Joseph Conforte when the judge informed them of his knowledge of Joseph Conforte's criminal record and that a prospective juror could be disqualified for such knowledge. Appellants' waiver of a jury trial was knowing and intelligent and was therefore valid. *Schneckloth v. Bustamonte*, 412 U.S. 218, 237–38, 93 S.Ct. 2041, 2052–53, 36 L.Ed.2d 854 (1973); *Patton v. United States*, 281 U.S. 276, 312, 50 S.Ct. 253, 263, 74 L.Ed. 854 (1930).

 Finally, appellants contend that Judge Thompson's statements regarding their *Sullivan-Garner* income tax returns [1] and the severity of the sentences imposed require recusal. These arguments are without merit. A judge's views on legal issues may not serve as the basis for motions to disqualify. *United States v. Azhocar*, 581 F.2d 735, 738 (9th Cir. 1978), *cert. denied*, 440 U.S. 907, 99 S.Ct. 1213, 59 L.Ed.2d 454 (1979); *United States v. Haldeman, supra*, 559 F.2d at 136. Although we conclude in section III that part of the sentences must be vacated, the record makes clear that the sentences were imposed to test appellants' right to file *Sullivan-Garner* returns and not because of any personal bias against them.

### III

### Sentencing

 While we affirm the judgments of conviction, we do find certain errors in the sentencing process, and we vacate portions of the sentences imposed upon the appellants. We discuss first the sentence imposed on Joseph Conforte.

On count VII of the indictment, the trial court sentenced Joseph Conforte to a term of imprisonment for five years, and in addition a $10,000 fine. This is the maximum penalty for violation of the statute, 26 U.S.C. § 7201. The trial court expressly stated that in imposing the maximum sen-

tence on Mr. Conforte it was taking into account his two previous felony convictions. This sentence was within the discretion of the court, and it was insulated from the sentences imposed on the three remaining counts, and the reasons for those sentences. We therefore affirm the sentence on count VII.

 We cannot sustain the sentence imposed on Mr. Conforte for the three remaining counts. The district court noted in the sentencing proceedings its concern with the income tax returns that had previously been filed by the Confortes. The Confortes had filed *Sullivan-Garner* income tax returns in which they claimed a fifth amendment privilege against disclosing the sources of their income. Judge Thompson asked Mr. Conforte's trial counsel whether or not tax counsel agreed with the position that the Confortes had a constitutional right to file returns "in which they just arbitrarily set forth a figure which they concede they owe the Government, without any supporting data to show how the computation was made." Counsel responded that this was the position of the Confortes and their tax counsel. The court responded that it thought "that position is 100% wrong . . . . The only possible incrimination they could incur, as I see it, or the basic possible incrimination would be incrimination for filing false and fraudulent tax returns . . . ." The court then stated that it proposed to test Joseph Conforte's right to claim a fifth amendment privilege for tax related offenses. The court sentenced Mr. Conforte to consecutive five-year terms on each of the three remaining terms, plus a $10,000 fine on each count. The court declared that its "sole and only reason" for adding the fifteen years to Conforte's sentence on count VII was because of its view that "this defendant has no constitutional right to file the type of income tax returns which he files."

There are two fundamental problems with these additional sentences. First, we have serious doubts that the trial court

---

1. *See United States v. Sullivan*, 274 U.S. 259, 47 S.Ct. 607, 71 L.Ed. 1037 (1927); *Garner v.* *United States*, 424 U.S. 648, 96 S.Ct. 1178, 47 L.Ed.2d 370 (1976).

acted properly in invoking the sentencing process for the principal purpose of securing a ruling from the Court of Appeals on an unsettled question of law.[2] However interesting the question may be, it is entirely unrelated to the defendant's prognosis for reform, and, given the intent of the court in imposing the sentence, it appears only tangentially related to the bearing of defendants' character and past conduct, factors which might otherwise be legitimate considerations in the sentencing process.

The sentencing process is too intertwined with the fundamental rights of the defendant and turns too closely upon a complicated interplay of the judge's own perceptions of the case and the defendant's fears, anxieties, and future intentions, that it should be used as a vehicle to secure an opinion from an appellate court. It is true that we must and do encourage judges to be candid and explicit in stating their reasons for imposing a sentence. We need not, however, set forth here with precision the line of demarcation between impermissible and permissible sentencing premises, for in this case there was a further error which is itself grounds for vacating the additional sentence. The error was that the trial judge based the sentence upon a legal and factual conclusion for which there was no support.

The trial judge imposed the sentence based on an assumption that defendants filed *Sullivan-Garner* returns solely to avoid possible incrimination under the tax laws. That assumption has no support. It is just as reasonable to assume, and indeed we think it may well have been the case, that the defendants filed *Sullivan-Garner* tax returns to avoid possible incrimination under laws unrelated to revenue collection. These laws would include statutes such as the Mann Act, 18 U.S.C. § 2421, or the Racketeer Influence and Corrupt Organizations Revision of the Organized Crime Control Act of 1970, 18 U.S.C. § 1962(a)–(d). The court held no hearing to inquire into the basis for the defendants' invocation of the privilege. The possibilities we suggest are probable grounds for assertion of the right, and we cannot characterize the privilege as resting upon the narrow grounds hypothesized by the trial court. Since the conclusion that the appellants had no reason to claim the privilege other than to avoid tax prosecution is without any factual support, it cannot be the basis for imposition of a sentence.

■ Although our role in reviewing sentences within statutorily prescribed bounds is a limited one, *see Dorzynski v. United States*, 418 U.S. 424, 94 S.Ct. 3042, 41 L.Ed.2d 855 (1974); *United States v. Stevenson*, 573 F.2d 1105 (9th Cir. 1978); *United States v. Lustig*, 555 F.2d 737, 751 (9th Cir.), *cert. denied*, 434 U.S. 926, 98 S.Ct. 408, 54 L.Ed.2d 285 (1977), we have held that a sentence must be vacated on appeal if the district court uses information which is "(1) false or unreliable, and (2) demonstrably made the basis for the sentence." *Farrow v. United States*, 580 F.2d 1339, 1359 (9th Cir. 1978) (en banc); *see Brown v. United States*, 610 F.2d 672 (9th Cir. 1980); *Gelfuso v. Bell*, 570 F.2d 754 (9th Cir. 1978); *United States v. Weston*, 448 F.2d 626 (9th Cir. 1971), *cert. denied*, 404 U.S. 1061, 92 S.Ct. 748, 30 L.Ed.2d 749 (1972). Such was the case here. Joseph Conforte's sentences and the fines imposed on the three counts in addition to count VII are therefore vacated and are remanded for further sentencing.

■ In the case of Sally Conforte, probation was made conditional upon future nonfiling of *Sullivan-Garner* returns. The court imposed this condition solely to test her right to file *Sullivan-Garner* income tax returns. We have held that "when fundamental rights are curbed [in imposing conditions on probation] it must be done sensitively and with a keen appreciation that the infringement must serve the broad purposes of the Probation Act." *United States v. Consuelo-Gonzalez*, 521 F.2d 259 (9th Cir. 1975) (en banc); *see Dacanay v. Mendoza*, 573 F.2d 1075 (9th Cir. 1978). A sentencing

2. In our recent opinion in *United States v. Carlson*, 617 F.2d 518 (9th Cir. 1980), we addressed the question of whether a person may claim a fifth amendment privilege on his tax returns to avoid incriminating himself for tax-related matters.

judge must formulate conditions of probation to avoid the risk of compelled self-incrimination. *United States v. Pierce*, 561 F.2d 735, 740 (9th Cir. 1977), *cert. denied*, 435 U.S. 923, 98 S.Ct. 1486, 55 L.Ed.2d 516 (1978). As we stated in *Pierce*:

[W]e must evaluate whether the condition imposed involves a proper accommodation between the need for information and those Fifth Amendment rights which [the probationer] retains . . . That analysis requires consideration of the condition of probation on its face and then as the condition is applied.

*Id.* at 740. The same reason that requires us to vacate the additional fifteen years added to Joseph Conforte's sentence requires us to vacate the special conditions on Sally Conforte's probation. The district court could not properly assume that the condition on its face did not require self-incrimination for nontax offenses. *See id.* at 741. We also vacate the consecutive $10,000 fines imposed on counts VIII through X.

## IV

### Conclusion

The convictions are affirmed. The denial of the motion for new trial is affirmed. The sentence and fine of Joseph Conforte on count VII are affirmed and the sentences and fines on the remaining counts vacated and remanded for further proceedings consistent with this opinion. The special conditions on Sally Conforte's probation and the fines for counts VIII through X are vacated.

So ordered.