## UNITED STATES

v.

## CLAIBORNE.

No. 84–1294.

United States Court of Appeals, Ninth Circuit.

Jan. 30, 1986.

REINHARDT, Circuit Judge, dissenting:

I respectfully dissent from the court's refusal to hear Judge Claiborne's appeal en banc.

This case is a most unusual one in a number of respects. It raises serious questions about the fair and impartial administration of justice.

I

### BACKGROUND

United States District Judge Harry E. Claiborne was originally indicted and tried in the United States District Court on four counts involving his alleged acceptance of bribes in the performance of his official duties, two counts of tax evasion unrelated to the alleged bribes, and one count of filing a false financial statement with the Judicial Ethics Committee. The false filing count was also unrelated to the bribery charges. The first jury was unable to reach a verdict on any of the counts, and a mistrial was declared. The government then dropped the most serious charges— the allegations relating to bribery—and Judge Claiborne was retried only on the unrelated tax and false filing counts. The second jury acquitted him of filing a false financial statement, but convicted him on the tax charges.

Judge Claiborne was tried before an out-of-circuit senior district judge specially assigned to preside over his case. The district judge sentenced him to a two-year term of imprisonment. A specially selected panel composed of three judges from other circuits affirmed his conviction. 765 F.2d

784. Judge Claiborne petitioned for a rehearing and suggested a rehearing en banc. The special panel denied the petition for rehearing and recommended that we reject the suggestion for a rehearing en banc. An active member of this court then called for a vote by the full court on whether to rehear the appeal en banc. The full court has now voted, and decided not to grant Judge Claiborne a rehearing.[1]

Throughout these proceedings, Judge Claiborne has claimed that his investigation and prosecution constituted a part of an effort by the Department of Justice's Organized Crime Strike Force and the F.B.I. to discredit him personally and bring about his removal from the bench. Prior to his appointment in 1978, Judge Claiborne had been a prominent trial lawyer and had defended numerous individuals accused of committing criminal offenses. He contends that after his appointment the government launched a vendetta against him as a result of his issuance of a number of significant rulings adverse to the Department of Justice in criminal cases.

The Strike Force and the F.B.I. appear to have begun investigating Judge Claiborne in early 1980. According to Claiborne, in the Spring of 1980 he was investigated by a Las Vegas grand jury at the request of those agencies. The investigation related to Claiborne's actions as a criminal defense attorney, particularly with regard to whether Claiborne participated in illegal wiretapping activities. Apparently the investigation proved fruitless and the grand jury, after several months of hearings, failed to return an indictment against Judge Claiborne. However, a local law enforcement officer who had supplied evidence exculpating Judge Claiborne was demoted to a desk job and was himself investigated by the F.B.I.

On April 4, 1980 United States Marshals seized from the offices of the Strike Force a display satirizing Judge Claiborne and Chief Judge Foley. Claiborne's attorney had complained that the exhibit was intimidating and prejudicing members of the grand jury that was investigating the Judge, as well as witnesses who were testifying before the grand jury. At a subsequent hearing, Judge Foley described the display as "contemptuous" of the judicial process and the result of "gross misconduct."

Judge Claiborne alleges that the F.B.I.'s next step, taken in late 1980, was to launch another investigation of him on a different subject, and this time to open his mail. Judge Claiborne claims that when he unsealed an envelope he had received through the mail it contained not only the enclosure intended for him but also an enclosure sent to another individual, a person who was also a target of the then current F.B.I. investigation. According to Claiborne, that investigation concerned his sentencing of Gus Gallo, a convicted bookmaker, and resulted from the belief of some Justice Department officials that Gallo had not received a sufficiently severe sentence. The Gallo investigation also apparently came to nought.

Next, the government obtained statements from one Joseph Conforte that Judge Claiborne had solicited and accepted bribes from him. Based on Conforte's statements, the Strike Force, the F.B.I., and the Internal Revenue Service commenced still another investigation of Judge Claiborne. Conforte was the long-time owner of the Mustang Ranch brothel in Storey County, Nevada, a former client of Judge Claiborne's and a fugitive from justice. Conforte had been sentenced to 20 years in prison after being convicted of four counts of failing to withhold federal income taxes from the salaries of certain of his employees. According to newspaper articles contained in the court record, Conforte's first charge against Claiborne was that he had bribed him in connection with the Judge's adjudication of certain post-trial motions in Conforte's criminal case.

---

**1.** As is explained at p. 1330, *infra,* six out of 25 active judges recused themselves and did not participate in the vote.

That charge apparently collapsed when it was determined that Judge Claiborne had never presided over or ruled on any aspect of Conforte's case, and that the motions had been decided by a district judge from California prior to Judge Claiborne's appointment to the bench.

Undiscouraged, the government began pursuing two other claims by Conforte that he had bribed the Judge. One of these bribery charge related to Judge Claiborne's treatment of certain subpoenas issued to employees of Conforte in a voting fraud investigation. The other involved a bribe supposedly paid to the Judge so that he would secure a favorable outcome in Conforte's appeal from his tax conviction; at the time of this alleged bribe the appeal was pending before a panel of this court. We ultimately affirmed Conforte's conviction, but remanded for resentencing on three of the counts. *United States v. Conforte*, 624 F.2d 869 (9th Cir.1980). The Supreme Court denied a writ of certiorari, 449 U.S. 1012, 101 S.Ct. 568, 66 L.Ed.2d 470 (1980), and shortly afterwards Conforte fled to Brazil.

The District Director of the Internal Revenue Service in Reno, Nevada, who was fully familiar with Conforte's background and record, opposed the investigation of Judge Claiborne, because it was based almost exclusively on Conforte's statements. In early 1982, the F.B.I. and the Internal Revenue Service launched a "sting" operation involving an attempt to bribe the District Director. In late 1982, after the plan to "bribe" him had failed, the District Director was transferred to another office. A Treasury Department investigator later condemned the F.B.I.—I.R.S. sting operation as "very dangerous, misleading and poor work."

Beginning in September 1982, the F.B.I. and the Department of Justice presented their case against Judge Claiborne to a grand jury in Portland, Oregon. Conforte did not testify because he was still a fugitive from justice. The grand jury failed to return an indictment.

The government's allegations were presented to a second grand jury in Portland beginning in early 1983. Conforte remained a fugitive. The grand jury once again failed to return an indictment.

Meanwhile, Conforte had been attempting for some time to negotiate a deal with the government. In late 1983 an agreement was reached under which Conforte would return from Brazil and be resentenced to four concurrent terms of five years each, 15 months of which were to be actually served in prison, while the remainder would be suspended. In addition, the government agreed to drop federal bail-jumping charges and persuade Nevada state officials to drop certain state charges against Conforte, as well as convince state prosecutors to agree to concurrent sentences on all remaining state charges.

Conforte returned to this country on December 4, 1983. In the meantime the government had presented his charges against Judge Claiborne to still another grand jury. This time, however, the government did not proceed in Portland, but chose Reno, Nevada as its forum. Conforte testified before the Reno grand jury three days after his return. The following day the grand jury returned a seven count indictment against the Judge.

One week after Judge Claiborne's indictment, Conforte was resentenced by Judge John Lewis Smith of the United States District Court for the District of Columbia. Conforte's case had been transferred to Judge Smith in October 1982 by order of the Chief Justice of the United States after the District Judge in Nevada who had previously presided over the case recused himself. The reduction in Conforte's sentence may well have violated Fed.R.Crim.P. 35, *see United States v. Hetrick*, 644 F.2d 752 (9th Cir.1980); *United States v. Pollack*, 655 F.2d 243 (D.C.Cir.1980), as well as 18 U.S.C. § 3651 (1982), not to mention the Justice Department's policy on tardy motions to reduce sentences.

Senior United States District Judge Walter E. Hoffman, of the Eastern District of Virginia, was specially designated by the

Chief Justice to preside over Judge Claiborne's trial. In early 1984, Judge Hoffman denied a series of pretrial motions filed by Claiborne. (Previously, Judge Hoffman had been specially designated by the Chief Justice to preside over the Portland and Reno grand jury investigations. These designations, like the trial designation, were made following a request by the Chief Judge of this circuit that an out-of-circuit district judge be appointed.) An appeal to this court followed.

At the time of the pre-trial appeal, the case against Judge Claiborne still included the charges relating to his alleged acceptance of a bribe intended to influence the results in an appeal before one of our panels. We as a court agreed, although in a rather informal manner, to recuse ourselves from hearing Judge Claiborne's pretrial appeal. The Chief Justice then specially selected a panel of three judges from other circuits to hear it. The special panel affirmed the pretrial rulings of the specially assigned district judge. 727 F.2d 842, *cert. denied,* — U.S. ——, 105 S.Ct. 113, 83 L.Ed.2d 56 (1984).

The trial then proceeded, with Joseph Conforte as a key government witness. Despite, or perhaps because of, Conforte's testimony the jury could not agree on a verdict on any of the counts.

Because the government abandoned the bribery charges prior to the second trial, Conforte did not testify the next time the prosecution sought to convict Judge Claiborne. Judge Hoffman once again presided over the trial. After the jury returned a guilty verdict on the tax charges, Judge Claiborne again appealed. This time we took no action to recuse ourselves. In fact, we did nothing at all. Although the bribery charges that indirectly involved our court in the proceedings were no longer a part of the case, we simply failed to consider, formally or informally, the question whether we now had an obligation to hear the appeal or whether a new special panel should be appointed. Apparently acting on the assumption that our prior recusal was a continuing one, the Chief Justice specially selected another panel of three judges from other circuits to hear the appeal.

## II

### ANALYSIS

It is clear to me that there was no reason in fact or law why a panel of judges of this court could not have heard Judge Claiborne's post-conviction appeal. The bribery charges had been dropped; the tax charges were unrelated to any alleged bribe and they in no way involved any member of this court. Moreover, our subsequent actions, specifically our en banc vote, show quite plainly that the overwhelming majority of the judges of our court believed that they were not required to recuse themselves from voting on a critical aspect of the proceedings on appeal. Our vote on the en banc call reveals that 19 members of this court, out of a then total of 25, concluded that it was proper for them to vote on the question whether or not Judge Claiborne's appeal should be given en banc consideration. Only six thought they were required to recuse themselves from participating in that decision. Because in my view there can be no distinction drawn between the propriety of a judge's voting on a call for a hearing en banc and the propriety of a judge's hearing the appeal itself, I believe that any three of the 19 judges of our court who voted on the en banc call could properly have heard the post-conviction appeal. Thus, in actuality, there was no need for the appointment of any out-of-circuit judges.

In my view, it is clear that we as a court committed a serious error in our handling of this case, an error with serious consequences. Specifically, we erred when we failed to consider whether we should hear Judge Claiborne's appeal from his conviction or whether, instead, the appointment of a second special panel was required. Because of our error, outside judges were appointed to hear an appeal that we had an obligation to hear ourselves. Our court system is structured so that a defendant will normally have his trial and any appeals

heard by judges residing in the circuit in which the charged crime was allegedly committed. Here, we erroneously, albeit inadvertently, deprived Judge Claiborne of this feature of our laws; en banc consideration of the Judge's case would have been a proper means of at least partially remedying our mistake.

Rehearings en banc provide a means for ensuring that the law of our circuit is applied not only consistently but correctly. Here, as a result of our failure to act, judges from other circuits, not as familiar as we are with the precedents of our court, considered a case that we had a duty to hear.[2] Judge Claiborne's appeal raises several issues of importance.[3] In disposing of at least one of those issues, the special outside panel cited no authority from any appellate court, let alone a decision by the judges of this court. The special panel also stated that it was not following the result reached in two of the three district court opinions that it cited. 765 F.2d at 794–95. In my view, when a substantial question of law not previously decided by the judges of this court is decided by a panel of outside judges and we subsequently recognize that we have erred in failing to decide that question ourselves, it is our responsibility to grant en banc reconsideration. Moreover, in this case there are additional reasons why we should have granted an en banc hearing. *See infra* at pp. 1332–33.

Some of the members of this court who voted against an en banc hearing may have believed that an appearance of impropriety would arise if we were to review the conviction of a district judge who sits within the geographical boundaries of the Ninth Circuit; they may have thought that a decision to hear Judge Claiborne's case en banc would be ill-advised since it might cause some to think less well of our court, or of courts in general. I respectfully suggest that a vote influenced by such institutional concerns would unfairly prejudice Judge

Claiborne's rights and contravene basic principles governing the law of recusal.

Courts must always strive to administer justice in a manner such that there is no appearance of either impropriety or injustice. At the same time, a court must never deprive a person of his right to just treatment or the opportunity to avail himself of the full procedural rights or protections to which he is entitled. Certainly it must not do so merely because a judge believes that it may appear to some persons that in affording an individual those rights the court has acted improperly. Our highest duty at all times is to provide justice to all litigants; no other principle is as important.

Normally, there is no conflict between our duty as individual judges to appear impartial and our obligation to afford justice to all. In those cases in which there is a conflict, there is usually some method of ensuring that both goals can be accomplished within the normal procedures governing the operation of the judicial system. For example, a trial judge faced with such a conflict can recuse himself, and another trial judge can be substituted. So, too, a circuit judge can, normally, readily be replaced by another circuit judge or even by a district judge. There are, however, a few cases in which there is no mechanism for resolving the conflict in a manner that allows the court to honor both obligations fully. In such cases the obligation to do justice prevails and the "rule of necessity" applies. Under that rule, the court must hear the case and do justice even though an appearance of interest or impropriety may exist. *See United States v. Will,* 449 U.S. 200, 213–17, 101 S.Ct. 471, 480–82, 66 L.Ed.2d 392 (1981).

The fact that Harry Claiborne is a United States District Judge does not mean that he is less entitled than any other individual to the full benefit of the orderly procedures of this court. Those procedures, including

---

**2.** While circuit judges from other circuits and district judges sit on Ninth Circuit panels, title 28 requires that at least two of the judges on any panel be judges of this court. 28 U.S.C. § 46(b)(1982). *See also* Ninth Circuit General Order 3.2(a) (same).

**3.** *See* Judge Ferguson's companion dissent for a discussion of two of those issues.

en banc consideration, have been established to ensure that justice is done. Our en banc process is also designed, as I noted earlier, to ensure that the law of this circuit will be applied uniformly to all defendants. Judge Claiborne has just as much right to have his case considered en banc as any other defendant. En banc proceedings are different in one critical respect, however, from all other proceedings this court conducts: only the judges of our court can hear a case of ours en banc. There is no procedure in current law for obtaining an out-of-circuit en banc panel. This is true even when an appeal is heard initially by a specially selected panel of out-of-circuit judges. Thus, if in fact an appearance of impropriety existed here, the rule of necessity would apply, and we would be required to disregard that appearance. Accordingly, if a factor in our decision to deny Judge Claiborne en banc consideration of his case was our concern over an appearance of impropriety, we have, in my view, seriously misconstrued our duty as judges of this circuit. In doing so, we have, unfortunately, also denied Judge Claiborne equal justice.

Moreover, had we agreed to rehear Judge Claiborne's case en banc, there would have been neither any actual impropriety nor any appearance of impropriety in our doing so. In my opinion, the public has the identical perception of a court of appeals' reviewing a district judge's conviction whether the appellate judges come from the same geographic area as the district judge or not. To most people the appearance would be similar whether the appellate judges were from the Ninth Circuit, or from the Second, Seventh or Tenth Circuits. If there were any appearance of impropriety in our hearing Judge Claiborne's case, it would stem from the fact that we are all judges together, all members of the "judicial fraternity", not from

the happenstance of our physical locations.[4] Yet, no one has suggested that the special panel of circuit judges did not act in a proper and impartial manner, or that an appearance of impropriety exists because that panel might have favored Judge Claiborne. I believe the public is sophisticated enough to accept the fact that if a judge is to be tried, he will be tried before colleagues who are members of the same profession and that those colleagues may in some cases even reside in the same section of our nation. In short, I do not believe that reasonable persons would have had cause to think that any impropriety might have existed had we, as a court, simply followed our regular procedures and heard Judge Claiborne's post-conviction appeal in the normal course.

There *is*, however, an appearance of impropriety or injustice in this case—one that I fear a majority of my colleagues may fail to recognize. That "appearance" does not militate against affording Judge Claiborne en banc consideration; rather, it strongly militates in favor of granting him a hearing. Our refusal to do so allows the record to rest with the appearance that Judge Claiborne may have been the object of *adverse* special treatment and, thus, the victim of injustice. Judge Claiborne is one of the few criminal defendants in the Ninth Circuit, if not in the nation, whose case has been handled, both in the District Court and in the Court of Appeals, exclusively by judges specially and specifically chosen to hear that particular case.[5] There is, in my opinion, a rather substantial appearance of injustice when a defendant who claims he is the victim of a vendetta on the part of various branches and agencies of the Department of Justice is deprived of the opportunity to be judged by those who would normally preside over his case and instead is tried and convicted before, and has his

---

4. Of course, if an individual judge has a particular personal or professional relationship with the defendant, individual recusal may be required.

5. There are no available statistics regarding the number of cases in which a similar designation of both out-of-circuit district and circuit judges has been made. Informal research makes it clear, however, that the procedure is invoked infrequently.

appeal heard by, judges all of whom are specially selected for their assignments.

There is no doubt that every step taken in appointing the specially designated judges fully complied with all existing statutes and rules. Moreover, there is no suggestion in this case that there was in fact anything improper about the designation of the judges, or that any of the judges involved in the selection process acted with anything less than the utmost integrity. Nevertheless, in a case in which the defendant contends that he is the object of a prosecutorial vendetta, in which the judges who heard the case were all specially selected under a process that permits the selector total discretion to choose whom he wishes, and in which we as a court erred in permitting the specially selected panel to hear the appeal, I believe that an en banc hearing is required—if for no other reason than to ameliorate, to the extent possible, the appearance of injustice. En banc consideration by the judges of this court, judges who were not specifically selected to hear Judge Claiborne's appeal, would have gone a considerable way towards accomplishing that objective.

Unfortunately, as events unfolded, only an en banc review by this court or a hearing by the United States Supreme Court could have afforded Judge Claiborne consideration of his case by a tribunal that had all the appearances of fairness. All courts that have previously heard his case are open to the charge that they were specially selected for the purpose of ensuring the desired governmental objective. In my opinion, the proceedings thus far afforded Judge Claiborne fall far short of meeting the "appearance of justice" standard. Because of our obligation to administer justice in a manner that maintains confidence in the fairness and objectivity of the judicial system, I believe that it was our duty and responsibility to hear his case en banc.

## III

### THE RULES

As mentioned above, every step taken in this case to appoint the various special judges was taken according to existing and duly promulgated rules. However, in my opinion, we should seriously, and quickly, re-evaluate those rules. Under 28 U.S.C. §§ 291 & 292, the Chief Justice of the Supreme Court must designate and assign a circuit or district judge to act as a circuit or district judge in another circuit upon receipt of a "certificate of necessity" from the chief judge of the circuit to which the judge will be assigned. The Chief Justice may select any judge he wishes; there are no published guidelines or standards. Thus, when a certificate of necessity is issued in a specific case or proceeding, there will always be an appearance that the judges designated are being hand-picked to decide the controversy.

This appearance is particularly strong in criminal cases. In my view, the current rules should be modified so that any out-of-circuit judges designated to hear specific criminal cases are selected by a random selection system through procedures that are a matter of public record.

There are various alternatives to the present system that might be considered. For example, the chief judge of each circuit could designate a number of judges who are available for such special assignments. Then, the Chief Justice could select the needed judges in a random drawing from the pool. Alternatively, a case in which all the judges of a circuit are recused could be assigned to another randomly chosen circuit. The trial judge could be selected according to any random selection procedure used in that circuit. Any appeals could be considered by panels from that circuit selected in the ordinary course. Any petition for a rehearing en banc could then be dealt with by the judges of that circuit in the regular fashion. Numerous other methods of ensuring the appearance of fairness and objectivity in the selection process could certainly be devised.

Of course, problems similar to those discussed above can arise when a chief judge of a circuit designates and assigns a district judge to hold court in another district

of that circuit pursuant to 28 U.S.C. § 292(b). A random selection system could also be devised for use by the chief judge of a circuit when he is required to make such a designation and assignment for purposes of a specific criminal case.[6]

## IV

## CONCLUSION

For the reasons set forth above, I respectfully dissent from the court's denial of an en banc hearing.[7]

---

6. In our circuit, intracircuit assignments of district judges are governed by guidelines, promulgated by the Judicial Council of the Circuit, that prescribe a regular, objective method for selecting judges to be designated to perform services in another district.

7. I, of course, express no opinion as to the outcome were we to consider Judge Claiborne's appeal en banc. For present purposes I need conclude only that en banc consideration is required.