**UNITED STATES of America, Appellee,**

v.

**Paul L. BARRETT, Appellant.**

No. 96–3009.

United States Court of Appeals, District of Columbia Circuit.

Argued Jan. 28, 1997.

Decided May 2, 1997.

948

John M. Colette, Jackson, MS, argued the cause for the appellant.

William D. Weinreb, Assistant United States Attorney, argued the cause for the appellee. Eric H. Holder, Jr., United States Attorney, and John R. Fisher, Elizabeth Trosman and Mark H. Dubester, Assistant United States Attorneys, were on brief.

Before GINSBURG, HENDERSON and TATEL, Circuit Judges.

Opinion for the court filed by Circuit Judge HENDERSON.

Concurring opinion filed by Circuit Judge TATEL.

KAREN LeCRAFT HENDERSON, Circuit Judge:

Appellant Paul L. Barrett appeals his conviction and sentences on two counts of making "a false material declaration" under oath in violation of 18 U.S.C. § 1623(a),[1] once before a grand jury investigating J.C. Herbert Bryant (Bryant) (count 4) and once at Bryant's subsequent bench trial (count 1). Barrett asserts that neither of the charged declarations was "material," as expressly re-

---

1. This section provides:

(a) Whoever under oath (or in any declaration, certificate, verification, or statement under penalty of perjury as permitted under section 1746 of title 28, United States Code) in any proceeding before or ancillary to any court or grand jury of the United States knowingly makes any false material declaration or makes or uses any other information, including any book, paper, document, record, recording, or other material, knowing the same to contain any false material declaration, shall be fined under this title or imprisoned not more than five years, or both.

18 U.S.C. § 1623(a).

quired by section 1623(a), and that the district judge erroneously enhanced the sentences on each conviction. For the reasons set out below, we conclude that the grand jury declaration was material but that the trial declaration was not. We further conclude that the sentencing enhancement on count 4 was proper.[2]

## I. BACKGROUND

On September 2, 1992, Bryant, a Virginia resident, drove his truck, outfitted with flashing lights, a siren and a police radio, into the District of Columbia and parked it outside the Mayflower Hotel, which was then hosting an Israeli diplomatic delegation. In the truck's rear compartment, in plain view, lay three 9 mm Beretta pistols, a .44 caliber magnum revolver, a .357 caliber magnum revolver and a .22 caliber derringer; in the front window was displayed a placard bearing the words "United States Marshal" in large bold print. The mobile arsenal eventually drew the attention of an Israeli security agent, the Mayflower Hotel's security director, two United States Diplomatic Security Service Agents and three Metropolitan Police Department (MPD) officers. When Bryant returned to the truck he explained to the MPD officers that he had left the weapons in the truck's rear compartment after a target shooting session at a northern Virginia firing range. He also claimed, according to trial testimony credited by the district judge, that he was a United States deputy marshal and had supporting credentials in a briefcase at home. In addition, he showed those present a Warren County, Mississippi Deputy Sheriff badge.

The MPD officers contacted the United States Marshal for the District of Columbia to determine whether Bryant was a deputy marshal. When the Marshal was unable to ascertain Bryant's status, despite repeated telephone inquiries to the national Marshals Service headquarters in Virginia, he directed his deputies to bring both Bryant and the truck to the District of Columbia Marshals Service office. After a short time the Mar-

shal released Bryant and his truck but retained the firearms. It was later determined that Bryant held no official position with the Marshals Service at that time, although he had been a "Special Deputy Marshal" for several successive one-year terms, the last of which ended on June 30, 1992.

About one month after the incident, on October 8, 1992, Barrett, then Sheriff of Warren County, Mississippi, wrote a letter at the request of Bryant and his lawyer addressed "To Whom It May Concern." The letter purported to "confirm that J.C. Herbert Bryant, Jr. is currently and has been continuously since April 9, 1984, a duly authorized Deputy Sheriff for Warren County, Mississippi" and averred that "[o]n September 2, 1992, Mr. Bryant was on a detail in the D.C. Metro areas performing duties as a Deputy Sheriff." Government's Record Material (Gov't Rec. Mat.) Tab O.

Over nine months later, in July 1993, Barrett was subpoenaed to appear before a grand jury investigating Bryant. On August 27, 1993 Barrett testified before the grand jury that Bryant was a "sworn" deputy sheriff and identified Bryant's signature on a certified copy of an oath of office dated April 6, 1987. The oath of office certificate bore the signature and seal of a Warren County court clerk. When asked about the "circumstances" surrounding the oath Barrett responded: "When he was sworn in, it was done in that clerk's office and they file it there then." Gov't Rec. Mat. Tab U at 34. Barrett further testified that he thought he had given Bryant "a badge and maybe a card" before that date but that "that doesn't have any authority with it until he was sworn in." *Id.* at 21. Later in his testimony he identified a photocopy of a Warren County deputy sheriff badge and a deputy sheriff identification card, dated April 9, 1984, bearing the signatures of Barrett and Bryant and the signature and seal of the same clerk as appeared on the oath of office certificate.

Almost two years after the Mayflower incident, on June 14, 1994, Bryant was indicted on 3 counts: (1) violating 18 U.S.C. § 912 in

---

**2.** Because we reverse the count 1 conviction for lack of materiality, we do not reach Barrett's sixth amendment challenge to that conviction or his challenge to the district judge's enhancement of the count 1 sentence.

that he "did falsely assume and pretend to be a Special Deputy United States Marshal and in such pretended character, demanded and obtained that he not be arrested by the Metropolitan Police Department for possessing and carrying weapons in the District of Columbia"; (2) violating D.C.Code § 22–3204(a) in that he "did carry, openly, and concealed on or about his person, pistols, without a license issued as provided by law"; and (3) violating 18 U.S.C. § 1001 in that "in · a matter within the jurisdiction of a department and agency of the United States, to wit, the United States Marshals Service, did knowingly make a false and fraudulent statement." Gov't Rec. Mat. Tab N.

Bryant was tried by consent by the district court in early October 1994, raising as a defense to the first and third counts that he never identified himself as a deputy marshal and as a defense to the second count that as a duly appointed deputy sheriff of Warren County, Mississippi he was exempt under D.C.Code § 22–3205(a) from the prohibition against carrying pistols without a license.[3] In support of the latter defense, Barrett testified at trial that he had "appointed" Bryant a "sworn" deputy in 1984 and "thought he was sworn in 1984, and he may be." Excerpt from 10/5/94 Trial Tr. at 34 (filed 10/26/94). Bryant testified with greater assurance that Barrett took him to the courthouse in 1984 and "had [him] sworn by the clerk." Excerpt from 10/6/94 Trial Tr. at 14 (filed 11/3/94). Also during the trial Barrett again identified the same 1984 badge and identification card and the same April 6, 1987 oath of office certificate that he had originally identified before the grand jury. This time, however, he testified that he could not say for certain whether Bryant had personally signed the oath. When pressed on cross-examination, he admitted the "possibility" that he himself had signed Bryant's name on the oath. Excerpt from 10/5/94 Trial Tr. at 45 (filed 10/26/94). A subsequent analysis by the Federal Bureau of Investigation con-

cluded that Bryant's signature on the oath "was written by" Barrett. Gov't Rec. Mat. Tab S. Barrett also acknowledged on cross-examination that he had received many benefits from his long-standing friendship with Bryant and his family, including hunting privileges on the Bryants' farm from Bryant's father, campaign contributions totaling about $1,000 from Bryant's mother, an expense-paid trip to Los Angeles from a law enforcement association headed by Bryant and a $4,600 loan and a motorcycle from Bryant himself. Barrett explained that he had "wrecked" the motorcycle and thereafter sold it to a Dr. Poole for $1500. Poole, who did not testify at Bryant's trial, had apparently earlier told investigating officers he paid Barrett $10,000 for the motorcycle.

On October 12, 1994 the district judge convicted Bryant on the first and third counts, finding that Bryant had misrepresented to various law enforcement officers on September 2, 1992 that he was a "Special Deputy United States Marshal" and that he had credentials at home to establish that status. The judge acquitted Bryant on count 2, concluding that the government "failed to prove beyond a reasonable doubt that on September 2, 1992 Mr. Bryant was not a duly appointed sworn deputy sheriff of the Warren County Mississippi Sheriff's Office"[4] and that Bryant therefore came within the exception to section 22–3204's prohibition. 10/12/94 Trial Tr. at 8 (filed 11/30/94). The judge noted in particular that "Mr. Bryant's credentials as a deputy sheriff are ... signed by clerk of court" and that "[t]here is no evidence that there is no 1984 oath on file, or of the circumstances of the clerk's signature and seal on Mr. Bryant's credentials." *Id.* at 8–9.

Nine months later, on June 13, 1995, a grand jury indicted Barrett on two counts of witness tampering in violation of 18 U.S.C. § 1512(b) (counts 2 and 3), one count of obstruction of justice in violation of 18 U.S.C. § 1503 (count 5) and two counts (those at

---

**3.** D.C.Code § 22–3205(a) provides in part: "The provisions of § 22–3204 shall not apply to marshals, sheriffs ... or their deputies...."

**4.** While it is of no consequence here, we note that the trial judge seems to have misallocated

the burden of proving a § 22–3205(a) defense which, under District of Columbia Law, rests on the defendant. *Middleton v. United States*, 305 A.2d 259 (D.C.1973); *Williams v. United States*, 237 A.2d 539 (D.C.1968).

issue here) of making false declarations under oath in violation of 18 U.S.C. § 1623(a) (counts 1 and 4). Specifically, count 1 charged Barrett with falsely testifying at Bryant's trial that he sold the motorcycle to Poole for $1500 (rather than $10,000) and count 4 charged him with falsely testifying before the grand jury that Bryant's signature on the April 6, 1987 oath of office certificate was in fact Bryant's.

The case was assigned to the same district judge who had tried Bryant. By agreement of the parties, counts 1 and 2 were severed and tried before the judge on stipulated facts.[5] On October 12, 1995 the judge found Barrett guilty of both counts and on January 23, 1996 he sentenced Barrett to two concurrent 15–month prison terms, to be followed by 2 years of supervised release, and fined him $2,000. The sentences were based in part on enhancements for breach of public trust on both counts and for obstruction of justice on count 1. Barrett appeals both the convictions and the sentences.

## II. DISCUSSION

■ Initially, we consider briefly two general challenges Barrett raises to his convictions. First, Barrett argues there was insufficient evidence to support the convictions because the trial exhibits were never formally admitted into evidence but only marked for identification. We find no merit to this challenge. The exhibits were treated below, without objection, as if they were admitted into evidence; they are therefore deemed admitted. *See United States v. Bizanowicz,* 745 F.2d 120, 123 (1st Cir.1984) (tape played for jury deemed admitted "where at least *a quo* there was no doubt that [it] was admitted, notwithstanding the judge's failure to instruct the courtroom deputy directly to mark the tape as an exhibit" and appellant did not object to playing); *United States v. Stapleton,* 494 F.2d 1269, 1270 (9th Cir.) (seven exhibits marked for identification but not formally offered or received into evidence deemed admitted where "[t]here was exten-sive testimony about each of them," "both parties, and the judge, acted as if they were in evidence, and the judge relied upon them in finding [the defendant] guilty" and "defense counsel raised no question about the exhibits not being in evidence"), *cert. denied,* 419 U.S. 1002, 95 S.Ct. 321, 42 L.Ed.2d 277 (1974).

■ We next reject Barrett's contention that the district judge was required to recuse himself under 28 U.S.C. § 455(a).[6] While recusal might well be prudent when a perjury bench trial involves testimony from a proceeding over which the same judge presided, section 455(a) does not require it. *See United States v. Parker,* 742 F.2d 127, 128–29 (4th Cir.) (§ 455 does not require judge to recuse himself from perjury prosecution for contradictory testimony at trial and hearing at both of which he presided), *cert. denied,* 469 U.S. 1076, 105 S.Ct. 575, 83 L.Ed.2d 514 (1984). In any event, Barrett did not request recusal below and has therefore waived his right to do so here. "More than one court has recognized the sensible principle that '[a] defendant cannot take his chances with a judge and then, if he thinks that the sentence is too severe, secure a disqualification and a hearing before another judge.'" *United States v. Owens,* 902 F.2d 1154, 1156 (4th Cir.1990) (quoting *Taylor v. United States,* 179 F.2d 640, 642 (9th Cir.1950)) (citation omitted). Thus, while section 455(a) contains no express timeliness provision, most circuits considering the matter have concluded that a litigant must raise the disqualification issue within a reasonable time after the grounds for it are known. *See United States v. Brinkworth,* 68 F.3d 633 (2d Cir.1995) ("Although § 455 does not specify a time limit for application, a timeliness provision has been judicially implied. A party must bring a disqualification motion 'at the earliest possible moment after obtaining knowledge of facts demonstrating the basis for such a claim.'") (quoting *Apple v. Jewish Hosp.,* 829 F.2d 326, 333 (2d Cir.1987)) (internal citations omitted); *Owens,* 902 F.2d at 1156

---

5. The other three counts were ultimately dismissed.

6. This section provides: "Any justice, judge, or magistrate of the United States shall disqualify himself in any proceeding in which his impartiality might reasonably be questioned."

("Timeliness is an essential element of a recusal motion.... It is judicially implied in § 455."); *Delesdernier v. Porterie,* 666 F.2d 116, 121–22 (5th Cir.), *cert. denied,* 459 U.S. 839, 103 S.Ct. 86, 74 L.Ed.2d 81 (1982) (concluding that "timeliness may not be disregarded in all cases regarding disqualification under § 455(a)" and that "the facts of the present case are well suited to a timeliness requirement"); *In re Kansas Pub. Employees Retirement Sys.,* 85 F.3d 1353 (8th Cir. 1996) ("We have held in the past that even though § 455 has no express timeliness requirements, claims under § 455 will not be considered unless timely made.") (citations omitted); *E. & J. Gallo Winery v. Gallo Cattle Co.,* 967 F.2d 1280, 1295 (9th Cir.1992) ("It is well established in this circuit that a recusal motion must be made in a timely fashion.... While there is no *per se* rule that recusal motions must be made at a fixed point in order to be timely, such motions 'should be filed with reasonable promptness after the ground for such a motion is ascertained.'") (citations omitted); *United States v. Slay,* 714 F.2d 1093, 1094 (11th Cir.1983) ("A motion to disqualify a magistrate under § 455(a) must be timely.") (citations omitted), *cert. denied,* 464 U.S. 1050, 104 S.Ct. 729, 79 L.Ed.2d 189 (1984). *But see SCA Servs., Inc. v. Morgan,* 557 F.2d 110, 117 (7th Cir. 1977) (rejecting timeliness requirement because "any decision to deny disqualification based on grounds of waiver and estoppel would frustrate the purpose of [section 455]"); [7] *cf. Polaroid Corp. v. Eastman Kodak Co.,* 867 F.2d 1415 (Fed.Cir.) (finding no timeliness requirement for claims under *subsection (b)* of section 455), *cert. denied,* 490 U.S. 1047, 109 S.Ct. 1956, 104 L.Ed.2d 425 (1989). Barrett was aware of the facts underlying his bias claim from the start. Accordingly, his attempt to raise it for the first time on appeal must be rejected as untimely. *See Delesdernier v. Porterie,* 666 F.2d at 122–23 ("[I]t cannot be seriously argued that Delesdernier or her counsel were unaware before trial began of facts which might arguably support a § 455(a) motion for disqualification. We think that the motion raised for the first time on appeal, and after two full trials on the merits, is too tardily made for us to consider it now.") (footnotes omitted); *Pedrina v. Chun,* 97 F.3d 1296, 1303 (9th Cir. 1996) ("Because the plaintiffs failed to raise their claims of judicial bias below, we will not consider them here.") (citing *E. & J. Gallo Winery,* 967 F.2d at 1295); [8] *United States v. Slay,* 714 F.2d at 1094 (where "counsel was aware prior to the hearing on the motion to suppress of the facts which he now contends support a § 455(a) motion," a disqualification argument raised first on appeal is "untimely and need not be considered by this Court on

7. The Seventh Circuit has since questioned the continuing force of the *Morgan* decision. *See United States v. Murphy,* 768 F.2d 1518, 1539 (7th Cir.1985) (noting the "[*Morgan*] decision stands alone" but concluding that it "need not decide whether to reconsider *Morgan*"); *Union Carbide Corp. v. U.S. Cutting Serv., Inc.,* 782 F.2d 710, 716–17 (7th Cir.1986) ("It should not go unmentioned that Union Carbide may have waited too long to move to recuse [the trial judge].... Although *SCA Services, Inc. v. Morgan, supra,* 557 F.2d at 117, holds that there are no time limits on motions to disqualify under 28 U.S.C. § 455, this position has been uniformly rejected in the other circuits. *See United States v. Murphy, supra,* 768 F.2d at 1539, and cases cited there. *Murphy* questions it and [*United States v. Balistrieri,* 779 F.2d 1191, 1205 (7th Cir.1985)], cited earlier, undermines it by stressing the importance of promptly raising any ground for questioning the judge's impartiality. But in view of our other grounds for rejecting Union Carbide's argument for recusal under section 455(a), we have no need to decide whether this holding of *Morgan* should be reconsidered.").

8. The holding in *Pedrina* is consistent with other recent Ninth Circuit decisions requiring a timely motion for disqualification under section 455(a). *See Davies v. Commissioner,* 68 F.3d 1129, 1130 (9th Cir.1995) (rejecting on appeal as "not timely" disqualification argument made one year after grounds were known and after adverse judgment issued); *E. & J. Gallo Winery,* 967 F.2d at 1295 (concluding on appeal that disqualification claim first raised in motion for new trial was "not timely"); *see also United States v. Conforte,* 624 F.2d 869, 879 (9th Cir.1980) (where defendant had "notice" before trial of alleged grounds for disqualification, disqualification claim first raised in new trial motion was untimely and its rejection unappealable). Two earlier Ninth Circuit decisions expressly stated that failure to move for recusal before the trial court "does not preclude raising on appeal the issue of recusal under § 455." *Pau v. Yosemite Park & Curry Co.,* 928 F.2d 880, 884–85 (9th Cir.1991); *Noli v. Commissioner,* 860 F.2d 1521, 1527 (9th Cir. 1988).

appeal"); *cf. United States v. Widgery*, 778 F.2d 325, 327 (7th Cir.1985) (rejecting section 455(a) claim on appeal "[b]ecause [the defendant] never moved for disqualification in the district court," reasoning: "Disqualification for the appearance of impropriety runs prospectively only; even a successful motion does not vitiate acts taken before the motion was filed.") (citing *United States v. Murphy*, 768 F.2d 1518, 1539–41 (7th Cir.1985)).

 We now reach the heart of Barrett's appeal of his convictions, namely neither of his misstatements under oath was "material" to the proceeding in which it was made as required under 18 U.S.C. § 1623(a).[9] "The test of materiality is whether the statement 'has a natural tendency to influence, or was capable of influencing, the decision of the tribunal in making a [particular] determination.' Proof of actual reliance on the statement is not required; the Government need only make a reasonable showing of its potential effects." *United States v. Hansen*, 772 F.2d 940, 949 (D.C.Cir.1985) (quoting *United States v. Diggs*, 613 F.2d 988, 999 (D.C.Cir. 1979), *cert. denied*, 446 U.S. 982, 100 S.Ct. 2961, 64 L.Ed.2d 838 (1980)) (alteration in original), *cert. denied*, 475 U.S. 1045, 106 S.Ct. 1262, 89 L.Ed.2d 571 (1986), *quoted in United States v. Dale*, 991 F.2d 819, 834 n. 27 (D.C.Cir.), *cert. denied*, 510 U.S. 906, 114 S.Ct. 286, 126 L.Ed.2d 236, 510 U.S. 1030, 114 S.Ct. 650, 126 L.Ed.2d 607 (1993). Applying this deferential standard, we do not believe Barrett's misrepresentation of the motorcycle's sales price was material.

The government would have us believe the misstatement had the potential to mislead the district judge regarding the motorcycle's value when Barrett received it from Bryant and thereby to diminish Barrett's bias toward Bryant, leading the district judge to credit Barrett's testimony regarding Bryant's status and, based on that testimony, to find that on September 2, 1992 Bryant was a deputy sheriff and therefore authorized to possess firearms in the District of Columbia under section 22–3205(a). We reject this tortuous reasoning. Even assuming Barrett's misrepresentation of the price at which he sold the motorcycle to Poole suggested the motorcycle was less valuable when Bryant gave it to Barrett than it in fact was, it is highly improbable that the difference in value would lead a fact finder to consider Barrett significantly less biased or less likely to testify in Bryant's favor given Barrett's considerable testimony about his long and beneficial relationship with Bryant and Bryant's family. Viewed against that background, the single gift of a motorcycle seems a rather trifling matter and Barrett's misrepresentation of its sales price even more so. In addition, Barrett's testimony constituted only a minor component of the substantial trial evidence, including the unchallenged 1984 badge and identification card, that convinced the judge Bryant was a bona fide Warren County deputy on September 2, 1992. Given the other, far more persuasive evidence of Bryant's status, it is difficult to conceive that the credibility of Barrett's corroboration would much matter to the finder of fact. In short, Bryant's misrepresentation regarding the motorcycle sales price lacked the "capability" or "natural tendency" to affect the trial's outcome that is necessary for a finding of materiality.

 By contrast, Barrett's misidentification of Bryant's signature on the April 6, 1987 oath of office certificate was material to the grand jury decision whether to indict. The test of materiality in a grand jury investigation is substantially the same as at trial, although we have stated that "[m]ore specifically, in a grand jury setting, the false testimony must have 'the natural effect or tendency to impede, influence or dissuade the grand jury from pursuing its investigation' " and that "the effect necessary to meet the materiality test is relatively slight, and certainly not substantial." *United States v. Moore*, 613 F.2d 1029, 1038 (D.C.Cir.1979) (quoting *United States v. Stone*, 429 F.2d 138, 140 (2d Cir.1970)), *cert. denied*, 446 U.S.

---

9. Barrett's counsel conceded the falsity of the representations before trial: "And to go to the nub of it, certainly we're not going to context [sic] that instead of $1,500 the motorcycle was sold for $10,000. And we're not going to contest that the signature that was on the oath of office in 1987 was that of—we're not going to say it was Bryant's signature.... [W]e are in effect embracing the alleged falsity of the two counts...." Gov't Rec. Mat. Tab C at 6–7.

954, 100 S.Ct. 2922, 64 L.Ed.2d 811 (1980). Under our precedent Barrett's misrepresentation to the grand jury had the "natural tendency" to influence its investigation.

Whether Bryant violated D.C.Code § 22–3204 by unlawfully carrying pistols in the District depended entirely on whether he came within the section 22–3205(a) exemption. The authenticity of Bryant's signature on the April 6, 1987 oath, indicating that he was sworn in on that date, was critical to the grand jury's resolution of the issue. Unlike the district judge, the grand jury heard no testimony that Bryant was sworn in at any other time and Barrett himself stressed to the grand jury that the badge and the 1984 identification card conferred no authority on Bryant "until he was sworn in." Thus, if the grand jurors determined Bryant had not been sworn in on April 6, 1987, they would most probably also conclude he was not a duly appointed deputy sheriff and not exempt from the prohibition of section 22–3204. We therefore conclude that Barrett's false authentication of the April 6, 1987 oath signature constituted a "false material declaration" within the meaning of 18 U.S.C. § 1623.

█ Finally, Barrett challenges the district judge's enhancement of his sentence on count 4 for abuse of public trust under section 3B1.1 of the United States Sentencing Guidelines. Barrett does not dispute that his position as sheriff was one of public trust but argues that his testimony before the grand jury could not have been an abuse of that position because he testified only in his individual, not in his official, capacity. We reject this argument as well. Section 3B1.1 provides for a 2–level enhancement "[i]f the defendant abused a position of public or private trust, or used a special skill, in a manner that significantly facilitated the commission or concealment of the offense." There can be little doubt, if any, that Barrett's position as sheriff "substantially facilitated" his false testimony. It was by virtue of his office that he was able to describe the circumstances surrounding the April 6, 1987 oath and to affirm that Bryant in fact affixed his own signature to it. Thus, according due deference to the district judge's conclusion that Barrett abused his office so as to facilitate

significantly his false identification of Bryant's signature, we affirm the two-point enhancement. *See United States v. Broumas*, 69 F.3d 1178 (D.C.Cir.1995) (district court's application of abuse of trust enhancement "receives due deference" on appeal), *cert. denied*, —— U.S. ——, 116 S.Ct. 1447, 134 L.Ed.2d 566 (1996).

For the preceding reasons, we reverse Barrett's conviction on count 1 and affirm his conviction on count 4. We further affirm the breach of trust enhancement of the sentence on count 4. Accordingly we remand for the district court to resentence Barrett on count 4 only insofar as his sentence on that count may be affected by our reversal of the count 1 conviction.

*So ordered.*

TATEL, Circuit Judge, concurring:

I agree that the district judge had no obligation to recuse himself under 28 U.S.C. § 455(a). Maj. Op. at 951. As the Supreme Court explained in *Liteky v. United States*, "opinions formed by [a] judge on the basis of facts introduced or events occurring in the course of the current proceedings, or of prior proceedings, do not constitute a basis for a bias or partiality motion unless they display a deep-seated favoritism or antagonism...." 510 U.S. 540, 555, 114 S.Ct. 1147, 1157, 127 L.Ed.2d 474 (1994); *see also United States v. Roach*, 108 F.3d 1477, 1483–84 (D.C.Cir. 1997). "[J]udicial rulings alone," the Court announced, "almost never constitute a valid basis for a bias or partiality motion[.] ... [o]nly in the rarest circumstances [do they] evidence the degree of favoritism or antagonism required...." *Liteky*, 510 U.S. at 555, 114 S.Ct. at 1157. Because Barrett argues for recusal on the basis of knowledge the district judge acquired and rulings it made in the course of Bryant's trial and Barrett's proceedings and because he makes no allegation of "deep-seated favoritism or antagonism," the judge was not required to recuse.

I disagree, however, with the court's further, and apparently unnecessary, statement that "Barrett did not request recusal below and has therefore waived his right to do so

here." Maj. Op. at 951. Unlike 28 U.S.C. § 144, which provides for recusal upon motion by a party, section 455(a) imposes an independent obligation on judges: "Any justice, judge, or magistrate of the United States *shall* disqualify himself in any proceeding in which his impartiality might reasonably be questioned." 28 U.S.C. § 455(a) (emphasis added). Failure to move for recusal may lower the standard of appellate review, *see* FED.R.CRIM.P. 52(b) ("Plain errors or defects affecting substantial rights may be noticed although they were not brought to the attention of the court."), but because section 455 requires judges to consider recusal *sua sponte, Christiansen v. National Sav. & Trust Co.*, 683 F.2d 520, 524 (D.C.Cir. 1982), such failure cannot entirely bar appellate review of a judge's exercise of this statutory duty. *See, e.g., Noli v. Commissioner*, 860 F.2d 1521, 1527 (9th Cir.1988) ("Failure to move for recusal at the trial level ... does not preclude raising on appeal the issue of recusal under § 455."); *United States v. Schreiber*, 599 F.2d 534, 535–36 (3d Cir.1979) (applying plain-error review to recusal claim first raised on appeal); *cf. United States v. Walker*, 473 F.2d 136, 138 (D.C.Cir.1972). Although I agree that timeliness is a factor to be considered, the obligation section 455(a) places on judges means that even an untimely recusal claim cannot deprive a circuit court of its responsibility to review a judge's failure to recuse. In my view, the integrity and public reputation of the federal judiciary require clear and firm answers on the merits to even delayed charges of judicial impropriety.