**UNITED STATES of America, Appellee**

v.

**Joann McCOY, Appellant**

**No. 99–3075.**

United States Court of Appeals, District of Columbia Circuit.

Argued Sept. 15, 2000.

Decided March 16, 2001.

Lisa B. Wright, Assistant Federal Public Defender, argued the cause for appellant. With her on the briefs was A. J. Kramer, Federal Public Defender.

Suzanne Grealy Curt, Assistant U.S. Attorney, argued the cause for Appellee. With her on the brief were Wilma A. Lewis, U.S. Attorney, John R. Fisher and Elizabeth Trosman, Assistant U.S. Attorneys.

Before: HENDERSON, RANDOLPH, and GARLAND, Circuit Judges.

Opinion for the Court filed by Circuit Judge GARLAND.

GARLAND, Circuit Judge:

On September 22, 1998, defendant Joann McCoy was found guilty of making a false statement for the purpose of influencing a federally insured bank, making a false statement for the purpose of influencing the Small Business Administration (SBA), and committing perjury at a 1995 bankruptcy proceeding. In this appeal, McCoy argues that her perjury conviction was supported by insufficient evidence and that

the district court committed five errors in calculating her sentence under the United States Sentencing Guidelines (U.S.S.G.). We affirm McCoy's perjury conviction and four of the five challenged sentencing calculations. We remand the case to the district court for further proceedings with respect to the fifth sentencing calculation.

I

In 1993, McCoy formed McCoy Waste Industries and Manufacturing Co. (MWI), of which she became president and 51% owner. The company was in the business of recycling waste paper into fuel pellets, and earned revenues from both hauling paper ("tipping fees") and selling pellets. On September 3, 1993, McCoy—on behalf of MWI—applied for a $296,014 loan from Adams National Bank to finance the purchase of a $385,000 pellet-making machine from Lundell Manufacturing Co. Adams National eventually approved the loan, and the SBA agreed to guarantee 80% of the principal. The collateral for the loan included a lien on MWI's furniture, fixtures, machinery, and equipment; a guarantee from MWI; and guarantees from McCoy and four of her close relatives.

As part of her loan application, McCoy submitted three documents to Adams National, which were forwarded to the SBA for approval: a personal financial statement declaring that McCoy and her husband had $1,482,000 in assets and $12,000 in liabilities, a resume indicating that McCoy had received a degree from Northern Virginia Community College, and a financial projection that MWI would earn tipping fees for hauling 100 tons of waste paper per day. McCoy subsequently admitted, at her criminal trial, that the personal financial statement failed to disclose her liability for a $100,000 loan from Central Fidelity Bank and that she had not received a degree from Northern Virginia Community College.

On October 4, 1993, an Adams National loan officer requested additional evidence to support MWI's tipping fees projection. In response, McCoy requested and received a faxed letter from Ed Warmus, a plant manager for Browning–Ferris Industries Recyclery. McCoy had listed Browning–Ferris on the loan application as one of MWI's primary suppliers of waste paper. Warmus' letter stated that Browning–Ferris anticipated supplying MWI with "at least 16 tons" of paper per day. McCoy directed her secretary, Kim Turner, to "white-out" the term "16 tons" each time it appeared in the letter, and to replace it with the term "100 tons." She then instructed Turner to fax the altered letter to Adams National. When Adams National expressed concern because the letter's tonnage figures were handwritten, McCoy directed Turner to type them in, mark the initials "EW" (for "Ed Warmus") beside each appearance of "100 tons," and refax the letter to Adams National. At trial, Warmus testified that he had not authorized the change to 100 tons.[1]

Several days prior to the November 1993 loan closing, Warmus informed McCoy that Browning–Ferris had decided to open its own landfill and would no longer provide waste paper to MWI. At the closing, however, McCoy certified that there had been "no substantial adverse change in financial condition, organization, operations, or fixed assets" since she filed the loan application. McCoy did not disclose Browning–Ferris' decision to cease supplying paper to MWI.

MWI failed to make the first payment on the loan. Thereafter, Adams National placed the loan in default, and, together with two other creditors, filed an involuntary bankruptcy petition against MWI. MWI countered by suing Adams National and Lundell in bankruptcy court for breach of contract, alleging misconduct in the sale and financing of the pellet-making machine. During the 1995 bankruptcy

---

1. The government also introduced MWI invoices showing that Browning–Ferris had been paying MWI to haul a daily average of only 16 tons.

proceeding, Adams National argued that McCoy had fraudulently induced it to provide the loan by altering the Warmus letter. In reply, McCoy testified that she had telephoned Warmus, and that he had authorized her to change the estimate from 16 to 100 tons, with the understanding that 100 tons was the "maximum amount" his facility could provide.

On March 13, 1998, a grand jury returned a ten-count indictment against McCoy. Four counts charged McCoy with making false statements for the purpose of influencing Adams National, in violation of 18 U.S.C. § 1014. These counts alleged that: (i) the personal financial statement submitted with the loan application failed to list McCoy's $100,000 loan from Central Fidelity Bank; (ii) the resume submitted with the application falsely represented that McCoy had a degree from Northern Virginia Community College; (iii) the Warmus letter was falsely altered to indicate that Browning–Ferris would supply 100 tons of paper instead of 16; and (iv) McCoy failed to reveal at the closing that Browning–Ferris would not continue to provide waste paper to MWI. Four additional counts charged McCoy with making these same false statements to the SBA, in violation of 15 U.S.C. § 645. The indictment's final two counts alleged that McCoy committed perjury at the 1995 bankruptcy proceeding, in violation of 18 U.S.C. § 1623, by testifying, inter alia, that Warmus had authorized her to change his supply estimate from 16 tons to 100.

On June 29, 1998, the district court ordered that the indictment's non-perjury counts be consolidated to avoid potential prejudice to the defendant. Thereafter, the government obtained a superseding indictment with four counts: the first alleged that McCoy made four false statements to Adams National; the second alleged that she made four false statements to the SBA; and the third and fourth repeated the original perjury counts. In

July of 1998, the case was transferred to a second district judge, who further pared the indictment by ordering the government to elect one of the two perjury counts.[2]

On September 22, 1998, the jury returned a guilty verdict on each of the three remaining counts. Using a special verdict form for Counts One and Two, the jury determined that McCoy had knowingly, and for the purpose of influencing Adams National and the SBA: (i) failed to disclose her financial liability for the Central Fidelity loan; (ii) caused a false letter to be submitted stating that Browning–Ferris would provide 100 tons of waste paper per day; and (iii) failed to reveal that Browning–Ferris would no longer be supplying any waste paper to MWI. Due to an illness of the second judge, the case was transferred to a third district judge for sentencing. Following an evidentiary hearing, the court imposed concurrent prison terms of 24 months on Count Two and 37 months on each of Counts One and Three. In the "Statement of Reasons" supporting this sentence, the court "adopt[ed] the factual findings and guideline application in the presentence report." Judgment at 6.

## II

McCoy asserts that the evidence supporting her conviction for committing perjury at the 1995 bankruptcy proceeding was insufficient because the transcript of that perjurious testimony was not admitted into evidence. Because McCoy failed to raise this objection before the district court, despite raising other specific objections to the sufficiency of the evidence, we review this claim for plain error only. Fed.R.Crim.P. 52(b); *United States v. Spinner*, 152 F.3d 950, 955 (D.C.Cir.1998). The standard of review is not particularly important in this case, however, because the record shows that the disputed tran-

---

**2.** At the close of the government's evidence, the court dismissed, as immaterial, the allega-tions concerning McCoy's resume in the indictment's first two counts.

script was admitted into evidence. Hence, there was no error, plain or otherwise.

The core of McCoy's argument is that the court reporter's transcript of her 1998 criminal trial does not record the admission of the 1995 bankruptcy transcript. There is, however, a plethora of other evidence that the transcript was admitted. First, the court clerk's exhibit list plainly states that the bankruptcy transcript, introduced as Exhibit 30, was "received into evidence" on September 17, 1998.[3] Second, the district court indicated its own understanding that it had admitted the bankruptcy transcript. Rejecting a government request to perform a demonstrative reading of the transcript, the court ruled such a reading unnecessary because the jurors "can read it just like they read all the other exhibits." 9/17/98 Tr. at 66.[4] Finally, McCoy's trial counsel made clear, as the court reporter's transcript shows, that she understood that the bankruptcy transcript had been admitted. Opposing the government's (renewed) attempt to have a tape of the bankruptcy testimony entered into evidence and played to the jury, McCoy's counsel said: "We have got the transcript. That is already in the record.... [T]he tape adds nothing, and it is just cumulative...." 9/18/98 Tr. at 3. *See United States v. Barrett,* 111 F.3d 947, 951 (D.C.Cir.1997) (holding exhibits "deemed admitted" into evidence where

they "were treated below, without objection, as if they were admitted").[5]

Because we conclude that the bankruptcy transcript was admitted into evidence, we find no ground for McCoy's challenge to her perjury conviction.

## III

McCoy also disputes the district court's application of five provisions of the Sentencing Guidelines, which collectively increased her offense level from 6 to 21, thereby substantially increasing her range of imprisonment. McCoy asserts that the court erroneously imposed: (i) an eight-level increase based on a loss calculation of $200,000 to $350,000, pursuant to U.S.S.G. § 2F1.1(b)(1); (ii) a two-level increase for "more than minimal planning," pursuant to § 2F1.1(b)(2); (iii) a two-level increase because McCoy "willfully obstructed or impeded ... the administration of justice," pursuant to § 3C1.1; (iv) a one-level increase because McCoy's perjury conviction was not grouped with her other two convictions, pursuant to § 3D1.2; and (v) a two-level increase for McCoy's role as an "organizer, leader, manager, or supervisor," pursuant to § 3B1.1(c).

In reviewing these sentencing challenges, we "give due regard to the opportunity of the district court to judge the credibility of the witnesses," "accept the findings of fact of the district court unless

---

3. *See* Fed. R.App. P. 10(a) (providing that the record on appeal includes all "original papers and exhibits filed in the district court"); *cf. Toucet v. Maritime Overseas Corp.,* 991 F.2d 5, 8 & n. 1 (1st Cir.1993) (including district court clerk's minutes as part of appellate record).

4. Earlier, the court had also rejected government requests to have a tape recording of McCoy's 1995 testimony admitted into evidence and played to the jury, declaring that there was no "need for playing the tape. You can put in the transcript. If you offer the transcript I will admit it into evidence, but that is all I am going to do." 9/17/98 Tr. at 65. In the same colloquy, the prosecutor moved the transcript into evidence. *Id.* at 64.

5. In her closing argument, the prosecutor likewise indicated her understanding that the transcript had been admitted, quoting it repeatedly and advising the jury that: "you'll have this transcript, Government Exhibit No. 30, which shows the entire portion of the testimony .... and I've also made copies for each of you so you won't have to share one piece of paper here." 9/21/98 Tr. at 6A–25. In rebuttal, the prosecutor asked the jurors to "[p]lease read the transcript excerpts that have been introduced into evidence." *Id.* at 6A–56. Neither McCoy's trial counsel nor the district court voiced any objection to these statements or to the jurors' receipt of individual copies of the transcript. *Id.; see Barrett,* 111 F.3d at 951.

they are clearly erroneous," and "give due deference to the district court's application of the guidelines to the facts." 18 U.S.C. § 3742(e); *United States v. Breedlove*, 204 F.3d 267, 272 (D.C.Cir.2000). Issues of law are reviewed de novo. *United States v. Drew*, 200 F.3d 871, 876 (D.C.Cir.2000); *United States v. Kim*, 23 F.3d 513, 517 (D.C.Cir.1994).

### A

■ McCoy's first challenge is to the application of Guideline § 2F1.1(b)(1), which prescribes an eight-level increase for conduct that caused a loss of $200,000 to $350,000. Application Note 8(b) to the guideline explains that "[i]n fraudulent loan application cases .... the loss is the amount of the loan not repaid ... reduced by the amount the lending institution has recovered (or can expect to recover) from any assets pledged to secure the loan." U.S.S.G. § 2F1.1, comment., n.8(b). Here, it is undisputed that the amount of the unrepaid loan to MWI was $296,014.00, and that the SBA ultimately recovered a total of $24,113.22 by selling the pelletmaking machine back to its manufacturer at a liquidation sale.[6] Accordingly, the court calculated the loss as $271,900.78 and increased McCoy's offense level by eight.

McCoy objects that this dollar figure understates "what the SBA could reasonably have expected to recover." Appellant's Br. at 44. Her principal argument is that the SBA should have been able to obtain more for the pellet-making machine, since the machine had been purchased for $385,000 only two years before. But whatever the SBA "should" have been able to recover, the fact remains that, in the words of the application note, "the amount the lending institution *has* recovered" is

only $24,113.22. (Emphasis added). Moreover, since the machine has been sold, the SBA "can expect to recover" nothing more. Hence, under the application note, no greater offset is indicated.

Nor is there any evidence that the liquidation sale was a sham, or that the SBA artificially depressed the value of the recovery. To the contrary, all circumstances indicate that the matter was handled as an arms-length, business transaction: The SBA engaged an independent appraisal company, which valued the machine at between $37,000 and $56,000; a professional auction company handled the sale; and the machine was sold to the highest of three bidders—which turned out to be the original manufacturer—for a price of $45,000. After deducting auctioneer's expenses and pre-sale storage costs, the SBA realized a net of $24,113.22. Although that amount is significantly less than MWI originally paid for the machine, the government explains the reduction in value as caused by market conditions and deterioration of the machine while at MWI. In light of the arms-length nature of the transaction, the district court's loss calculation cannot be described as clearly erroneous. Accordingly, McCoy's offense level was properly increased by eight levels pursuant to U.S.S.G. § 2F1.1(b)(1).[7]

### B

McCoy's second challenge is to the two-point increase she received under Guideline § 2F1.1(b)(2) for "more than minimal planning." The Guidelines define that phrase as follows:

> "More than minimal planning" means more planning than is typical for commission of the offense in a simple form.

---

**6.** MWI's only other asset of value was a forklift, which was appraised at $1,200 and sold to MWI's landlord for $1,000 to offset storage costs. No buyer could be found for MWI's residual office furniture and equipment, which were abandoned because their appraised worth was below their removal and storage costs.

**7.** McCoy also contends that the SBA unjustifiably delayed in attempting to recover funds from the loan's guarantors. The only guarantors other than MWI and McCoy, however, were McCoy's relatives, and she has offered no evidence that there was any realistic prospect of a recovery from them that would have materially affected her guidelines calculation.

"More than minimal planning" also exists if significant affirmative steps were taken to conceal the offense. . . .

"More than minimal planning" is deemed present in any case involving repeated acts over a period of time, unless it is clear that each instance was purely opportune. Consequently, this adjustment will apply especially often in property offenses.

U.S.S.G. § 1B1.1, comment., n.1(f), *incorporated by reference in* § 2F1.1(b)(2), comment., n.2. As this definition makes clear, more than minimal planning may be found in any of the following three circumstances: (i) the offense entailed more planning than is typical for commission of the offense in a simple form; (ii) significant affirmative steps were taken to conceal the offense; *or* (iii) the offense involved repeated, not purely opportune acts over a period of time.[8]

█ McCoy's presentence report ("PSR"), whose findings the district court adopted, recommended a more than minimal planning enhancement based on the third prong of the guideline's framework—repeated acts that were not purely opportune. PSR ¶ 43.[9] We have previously held that satisfaction of the repeated acts criterion requires at least three acts over a

period of time. *Kim,* 23 F.3d at 515. Once three acts have been identified, more than minimal planning is "deemed" present, "unless it is clear that each instance was purely opportune." U.S.S.G. § 1B1.1, comment., n.1(f), *incorporated by reference in* § 2F1.1(b)(2), comment., n.2.[10]

█ Every circuit that has addressed the question, including our own, has defined "purely opportune" acts as those undertaken on the spur of the moment, in response to a sudden, fortuitous opportunity of which the defendant took advantage without deliberation.[11] Moreover, because § 1B1.1's third prong is independent of its first, the guideline contemplates that an act may not entail more planning than is typical of the offense in its simple form, and yet still warrant enhancement if it is part of a series of repeated acts that are not purely opportune. Defendant conceded as much at oral argument. *See also United States v. Monaco,* 23 F.3d 793, 797–98 (3d Cir.1994) (requiring enhanced sentence, although defendant's submission of repeated false labor sheets constituted only "a simple repetition of a simple plan" (emphasis omitted)); *United States v. Rust,* 976 F.2d 55, 57 (1st Cir.1992) (requiring enhanced sentence for repeated acts, even assuming defendant "engaged in

---

**8.** *See United States v. Lutz,* 154 F.3d 581, 590 (6th Cir.1998); *United States v. Viemont,* 91 F.3d 946, 952 (7th Cir.1996); *United States v. Clements,* 73 F.3d 1330, 1340–41 (5th Cir. 1996); *United States v. Bridges,* 50 F.3d 789, 791 (10th Cir.1994); *United States v. Mullins,* 996 F.2d 1170, 1171 (11th Cir.1993); *United States v. Rust,* 976 F.2d 55, 57 (1st Cir.1992).

**9.** *See generally United States v. Valdez–Torres,* 108 F.3d 385, 390 (D.C.Cir.1997) (holding that "by adopting the presentence report, the district court made the requisite finding" under the Guidelines); *United States v. Strothers,* 77 F.3d 1389, 1394 (D.C.Cir.1996) ("The district court adopted the [presentence] report's findings and we may review them only for clear error.").

**10.** The literal language of the application note states that an increase is appropriate unless *each* of the three acts was purely opportune— i.e., as long as one of the three was not purely

opportune, the increase is appropriate. As we conclude that none of McCoy's three acts was purely opportune, we need not decide whether this literal reading is correct. *See United States v. Maciaga,* 965 F.2d 404, 407 (7th Cir.1992) (suggesting that the enhancement requires that none of the acts be purely opportune).

**11.** *E.g., Lutz,* 154 F.3d at 590 ("There is no indication that any of these actions were the result of spur of the moment conduct such as would warrant a finding that the conduct was purely opportune."); *United States v. Broumas,* 69 F.3d 1178, 1183 (D.C.Cir.1995) (affirming enhancement because acts were not prompted by "fortuitous circumstances"); *United States v. Monaco,* 23 F.3d 793, 797 (3d Cir.1994) ("[P]urely opportune ... has been appropriately defined as spur of the moment conduct, intended to take advantage of a sudden opportunity." (internal quotation omitted)); *Rust,* 976 F.2d at 57 (same).

no more planning than would be typical for the crime of mail fraud, which, by its very nature, involves planning"); *see generally Kim*, 23 F.3d at 515 (noting two "guideline paradigms of more than minimal planning—repeated acts and more planning than is typical for the simple form of the crime").

 Reviewing the sentencing court's factual findings for clear error, and giving due deference to its application of the Guidelines to the facts, we find the third prong of the more than minimal planning enhancement satisfied here. *See Kim*, 23 F.3d at 517 (holding that appellate court should afford due deference to district court determination that defendant engaged in more than minimal planning).[12] Although the presentence report did not specifically indicate which of McCoy's acts it relied upon to justify the enhancement, it described at least three that clearly qualify.[13] The first is McCoy's submission of the September 1993 loan application, which falsely understated her liabilities by omitting her $100,000 liability to Central Fidelity Bank. The second is the submission of the October 1993 Warmus letter, which McCoy altered to state falsely that Browning–Ferris would provide MWI with 100 tons of paper per day. The third is McCoy's November 1993 certification, at the closing on the Adams National loan, stating that there had been no substantial adverse change since the original application and failing to disclose that Browning–Ferris had decided to stop supplying MWI with waste paper.

McCoy does not dispute that these three acts were "part of the same course of conduct or common scheme or plan as the offense of conviction," thus constituting

part of the "relevant conduct" used in determining her appropriate guideline range. U.S.S.G. § 1B1.3(a)(2). Nor does she contest that these acts occurred "over a period of time," namely three months. U.S.S.G. § 1B1.1, comment., n.1(f), *incorporated by reference in* § 2F1.1(b)(2), comment., n.2. Accordingly, the two-point increase for more than minimal planning is proper unless "it is *clear* that each [act] was purely opportune." *Id.* (emphasis added). Here, that is not at all clear; to the contrary, each act appears to have been a calculated step in McCoy's fraudulent pursuit of the Adams National loan.

McCoy concedes that her first act, submitting a false financial statement with her initial loan application, was not purely opportune. Reply Br. at 2. McCoy initiated the application and had ample time to contemplate the financial data she included therein. *See United States v. Lutz*, 154 F.3d 581, 590 (6th Cir.1998) (holding that the submission of "false information with regard to loan applications" was not the "result of spur of the moment conduct"). Nor was McCoy's second act, submitting the altered Warmus letter, a spur-of-the-moment event. *See Breedlove*, 204 F.3d at 272–73 (affirming finding that presentation of altered check for deposit was not purely opportune). Indeed, altering the letter required McCoy to take a series of component steps, each evincing deliberation and calculation: McCoy sought the letter from Warmus in order to satisfy Adams National's doubts concerning the tipping fees projection in her loan application; when she received a figure far below that which she had submitted to Adams National, McCoy instructed her secretary to white-out the references to 16 tons,

---

12. Because we find the enhancement justified by the "repeated acts" rationale, we do not consider whether McCoy's sentence could also have been properly enhanced under either of the first two prongs—i.e., because her conduct entailed more planning than is typical for commission of the offense in a simple form, or because significant affirmative steps were taken to conceal the offense.

13. The fact that not all three of these acts were mentioned by the probation officer at the sentencing hearing is not determinative, because the district court expressly adopted all of the PSR's factual findings and guideline applications without limitation. *See United States v. Bridges*, 175 F.3d 1062, 1069 n. 8 (D.C.Cir.1999).

replace them with handwritten "100 tons," and fax the altered letter to the bank; when Adams National expressed concern that the tonnage figures were handwritten, McCoy directed her secretary to type them in, and, in order to create an aura of authenticity, further directed her secretary to inscribe Ed Warmus' initials next to the tonnage terms; she then directed that the letter be refaxed to Adams National. Finally, we do not regard McCoy's third act, her false certification at the loan closing, as either spur of the moment or fortuitous: Adams National had made clear that MWI's tipping fees projection was critical, and Warmus had advised McCoy of Browning–Ferris' stunning change of plans, which invalidated that projection, several days before the closing—again giving her ample opportunity for contemplation.

Accordingly, because McCoy's relevant conduct included repeated acts, and because it is not "clear that each instance was purely opportune," we conclude that the district court properly increased McCoy's offense level under Guideline § 2F1.1(b)(2).

### C

■ McCoy also contends that the district court incorrectly imposed a two-point increase in offense level because she "willfully obstructed ... or attempted to obstruct ... the administration of justice" during the course of her prosecution. U.S.S.G. § 3C1.1. The presentence report recommended this increase based on a finding that McCoy had committed perjury during her criminal trial by testifying, inter alia, that Warmus authorized her to alter his letter's tonnage estimates.

McCoy correctly notes that at the time she committed her offenses, this circuit

required "clear and convincing" evidence for § 3C1.1 enhancements based on a defendant's alleged perjury at trial.[14] She claims that it is not apparent whether the sentencing court used that standard. And she argues that the court could not possibly have found clear and convincing evidence that she lied at trial because there was conflicting testimony—most importantly, between her description of events and that of Warmus. The sentencing judge was not in a position to resolve the alleged conflicts, McCoy argues, because that judge did not preside over the trial (a transfer having occurred due to the trial judge's illness) and hence did not personally observe the witnesses' demeanor.

Defendant's arguments are rendered irrelevant by the trial jury's verdict, on Count Three of the indictment, that McCoy committed perjury at the 1995 bankruptcy proceeding when she testified that Warmus had given her permission to change the contents of his letter. *See* Second Retyped Indictment ¶¶ 17–26 (App. 144–48). McCoy's testimony to the same effect at her 1998 criminal trial was the principal ground for the presentence report's conclusion, adopted by the sentencing judge, that McCoy had likewise committed perjury at that trial and therefore deserved the two-point enhancement for obstruction of justice. Since the jury reached its conclusion based on a standard more stringent than "clear and convincing" evidence—i.e., evidence beyond a reasonable doubt—and since the district court was entitled to rely upon the jury's verdict at sentencing, the court's opportunity to observe the testimony is irrelevant and the defendant's complaint necessarily fails. *See United States v. Montague*, 40 F.3d 1251, 1256 n. 4 (D.C.Cir.1994) (holding that

---

14. *Compare United States v. Montague*, 40 F.3d 1251, 1254 (D.C.Cir.1994) (requiring clear and convincing evidence), *with United States v. Dozier*, 162 F.3d 120, 124 n. 1 (D.C.Cir.1998) (noting that guideline amendment, which took effect on November 1, 1997, now requires only proof by preponder-

ance). In light of our disposition, we need not consider the government's contention that the relevant time for determination of the appropriate standard of proof is the date of defendant's obstruction—here, her 1998 trial perjury—rather than the date of her indicted offenses—the last of which occurred in 1995.

§ 3C1.1 enhancements are proper where juries have found "beyond a reasonable doubt that the defendant lied, and could not have convicted otherwise" (quoting *United States v. Thompson*, 962 F.2d 1069, 1071 (D.C.Cir.1992))).[15]

At oral argument, McCoy conceded the force of this point, agreeing that if her testimony at the bankruptcy proceeding had been the same as her testimony at the criminal trial, the jury's finding that she committed perjury at the former would establish that she did so at the latter as well. McCoy argues, however, that her testimony was not the same in both proceedings, and hence that we cannot be certain whether the bankruptcy testimony that the jury found perjurious was the same as her testimony at the trial of the criminal case.[16]

Defendant did not make this argument below, thus limiting our review to plain error. *See* Fed.R.Crim.P. 52(b).[17] Indeed, at sentencing she took the opposite position: McCoy told the court that she had made "precisely the same statement" in both proceedings. Def.'s Supp. Sentencing Mem. at 5 (App. 211); *see also* Sentencing Hr'g Tr. at 68 ("Ms. McCoy was convicted of false statements and she was convicted of perjury for the same testimony that she gave in her bankruptcy proceeding." (statement of defense counsel)). McCoy made this claim in support of a double jeopardy attack on the proposed perjury enhancement: She argued that since she had been "convicted of perjury for statements that she made during a bankruptcy proceeding," and since she had made "precisely the same statement" during her criminal trial, "[t]o convict her of perjury and then to enhance her sentence on essentially the same conduct is unconstitutional [under] the Double Jeopardy Clause of the Constitution." Def.'s Supp. Sentencing Mem. at 5 (App. 211). Although defendant does not pursue her double jeopardy argument on appeal, she is nonetheless hoisted by her own petard. Since McCoy told the sentencing judge that she was convicted of perjury for making "precisely the same statement" at the 1995 bankruptcy proceeding as she made at her 1998 criminal trial, it was hardly plain error for the judge to conclude that she committed perjury at the latter, just as she had at the former.

### D

■ Fourth, McCoy challenges the district court's failure to group her perjury conviction with her two false statement

---

15. We do not, in any event, accept defendant's proposition that a court cannot resolve disputes over the credibility of witnesses without directly observing their demeanor. To the contrary, demeanor is only one of many bases upon which factfinders may judge credibility. *See Carbo v. United States*, 314 F.2d 718, 749 (9th Cir.1963) ("Credibility involves more than demeanor. It apprehends the over-all evaluation of testimony in the light of its rationality or internal consistency and the manner in which it hangs together with other evidence."); 1 J. Strong, McCormick on Evidence § 33, at 123–24 (5th ed.1999) (noting that credibility may be attacked through, inter alia, prior inconsistent statements, proof of bias, evidence of character, capacity to observe, and proof of contrary facts); *see also* Fed.R.Evid. 608, 609, 801(d)(1)(A). Moreover, the Sentencing Reform Act states that courts of appeals "shall give due regard to the opportunity of the district court to judge credibility of the witnesses, *and* shall accept the findings of the district court unless they are clearly erroneous." 18 U.S.C. § 3742(e) (emphasis added). Thus, the ultimate question is whether the district court's findings are clearly erroneous; the kind of opportunity the court had to evaluate credibility is simply a factor we must take into account in making that determination. In this case, although the sentencing judge did not preside at trial, she did have before her a transcript of the relevant witnesses' testimony, provided as an attachment to the government's sentencing memorandum.

16. Although we do not find McCoy's efforts to distinguish the two testimonies convincing, the discussion that follows makes it unnecessary to address the distinctions she claims.

17. The government, by contrast, did seek to rely on the jury's finding of perjury. Government's Mem. in Aid of Sentencing at 12–13.

convictions. *See* U.S.S.G. § 3D1.2. That decision increased McCoy's offense level by one. *See* U.S.S.G. § 3D1.4; PSR ¶¶ 54–58.

Guideline § 3D1.2 states:

All counts involving substantially the same harm shall be grouped together into a single Group. Counts involve substantially the same harm within the meaning of this rule:

. . .

(b) When counts involve the same victim and two or more acts or transactions connected by a common criminal objective or constituting part of a common scheme or plan.

McCoy asserts that, under § 3D1.2(b), the court should have grouped her perjury count with the other two because all three crimes involved the "same victims"— namely, Adams National and the SBA.[18] The government, on the other hand, contends that while Adams National and the SBA were the victims of the false statement counts, society at large was the victim of McCoy's perjury in the bankruptcy proceeding. We believe the government has the better of the argument.

The Guidelines state that the "victim" of an offense generally is the "one person who is directly and most seriously affected by the offense." U.S.S.G. § 3D1.2, comment., n.2. There is no doubt that Adams National and the SBA were the victims of McCoy's false statements in connection with the loan application, but there is no evidence that they were affected by McCoy's perjury in the 1995 bankruptcy proceeding—much less that they were "directly and most seriously affected." McCoy does not contend that either institution relied upon that false testimony. Indeed, the SBA does not appear to have participated in the bankruptcy proceeding at all, while Adams National won every significant issue contested therein. *See McCoy's Waste Indus. & Mfg., Inc. v. Adams Nat'l Bank*, Adv. No. 94–0096, slip op. at 1, 50–52, 1995 WL 908054 (Bankr. D.C. Oct. 4, 1995). It is therefore difficult to discern how either entity could have been adversely affected by McCoy's perjury. *Cf. United States v. Norris*, 217 F.3d 262, 272 (5th Cir.2000) (holding that, for purposes of 18 U.S.C. § 3663, creditors in bankruptcy proceeding were not "victims" of perjury when they neither relied on the false testimony nor incurred any losses as a consequence thereof).

The Guidelines further provide that "[f]or offenses in which there are no identifiable victims . . . the 'victim' for purposes of subsections (a) and (b) is the societal interest that is harmed." U.S.S.G. § 3D1.2, comment., n.2. It is well-recognized that the societal interest harmed by perjury is the integrity of the legal system.[19] Since the perjury count therefore involved a different victim from the false statement counts, the one-level increase under § 3D1.2(b) was warranted in this case. *Cf. United States v. Napoli*, 179 F.3d 1, 7–8 (2d Cir.1999) (declaring that, under § 3D1.2(b), victims of fraud are those who lose money thereby, while vic-

---

18. At oral argument, the government appeared to accept McCoy's claim that Adams National and the SBA (rather than each individually) should together be deemed "the victim" of the false statements. Moreover, neither party has addressed whether this case satisfies the second requirement of § 3D1.2(b), namely, that the counts also involve "two or more acts or transactions connected by a common criminal objective or constituting part of a common scheme or plan." Accordingly, we do not address these issues here.

19. *See, e.g., United States v. Kiszewski*, 877 F.2d 210, 214 (2d Cir.1989) ("[P]erjury strikes at the heart of the integrity of the judicial system. . . ."); *cf. Hazel–Atlas Glass Co. v. Hartford–Empire Co.*, 322 U.S. 238, 246, 64 S.Ct. 997, 88 L.Ed. 1250 (1944) ("[T]ampering with the administration of justice involves far more than an injury to a single litigant. It is a wrong against the institutions set up to protect and safeguard the public, institutions in which fraud cannot complacently be tolerated consistently with the good order of society."), *overruled on other grounds by Standard Oil Co. v. United States*, 429 U.S. 17, 18 & n. 2, 97 S.Ct. 31, 50 L.Ed.2d 21 (1976).

tim of money laundering is society as a whole).

### E

Finally, McCoy argues that the district court wrongly imposed a two-level enhancement based on her role as "an organizer, leader, manager, or supervisor" of a criminal activity. U.S.S.G. § 3B1.1(c). "To qualify for an adjustment under this section, the defendant must have been the organizer, leader, manager, or supervisor of one or more other *participants*." *Id.*, comment., n.2 (emphasis added).

■ The presentence report explained its recommendation of the enhancement as follows:

> The defendant was the President of McCoy's Waste. As such, she held a leadership and managerial role over the employees of McCoy's Waste, *who were unwitting participants* in the fraud. Specifically, the defendant directed the activities of Kim Turner, secretary at McCoy's Waste. Pursuant to U.S.S.G. § 3B1.1(c), two levels are added.

PSR ¶ 45 (emphasis added). As McCoy correctly notes, however, supervision of an unwitting individual cannot justify an enhancement under U.S.S.G. § 3B1.1(c). The guideline commentary requires supervision of one or more "participants," and a "participant" is defined as a person who, although not necessarily convicted, "is criminally responsible for the commission of the offense." U.S.S.G. § 3B1.1, comment., n.1. Because an individual cannot be criminally responsible for making a false statement unless she is witting, *see* 18 U.S.C. § 1014 (requiring that false statement be made "knowingly"), the fact that McCoy's employees were unwitting would appear to render this enhancement inapplicable. *See United States v. Bapack*, 129 F.3d 1320, 1325 (D.C.Cir.1997) (holding that a person is "criminally responsible" under § 3B1.1 only if "he commit[s] all of the elements of a statutory crime

*with the requisite mens rea*" (internal quotations omitted) (emphasis added)).

The government does not dispute this reading of the guideline, suggesting instead that the word "unwitting" was merely a typographical error in the presentence report, and that the probation officer who wrote it must have intended to indicate that Turner was an "unwilling" participant. As the government points out, the probation officer twice rejected McCoy's argument that Turner was not a criminally responsible participant, writing that "Turner was criminally responsible for the offense as she altered the letter, at the instruction of the defendant." PSR Addendum at 29; *see* Sentencing Hr'g Tr. at 82. On the other hand, as McCoy correctly notes, altering the letter "at the instruction of the defendant" is still not the same as being "witting," unless Turner knew that Warmus had not authorized the alteration. In rebuttal, the government contends that there was sufficient evidence from which the sentencing court could have found Turner criminally responsible under a correct legal standard, noting that Turner testified that she "knew" that altering the letter "was wrong to do." 9/17/98 Tr. at 12.

Whatever the sentencing court intended to find or could have found, on the record before us we cannot conclude with confidence that it employed the correct legal standard in applying the § 3B1.1(c) enhancement. Accordingly, the enhancement cannot stand, and we remand the case for resentencing with instructions to resolve the ambiguities in the court's application of U.S.S.G. § 3B1.1. *See* 18 U.S.C. § 3742(f)(1) (requiring remand where sentence is imposed in violation of law or as result of incorrect guideline application); *Dozier*, 162 F.3d at 128 (noting that remand is appropriate where reasonable likelihood exists that trial court based decision on impermissible factor and where issue cannot be resolved without more complete statement of court's reasoning);

see also *United States v. Saro,* 24 F.3d 283, 288–89 (D.C.Cir.1994).

mand for further proceedings with respect to the fifth.

## IV

For the foregoing reasons, we affirm McCoy's conviction of perjury, reject four of her five sentencing challenges, and re-